# JOSEPH DIENER, Appellant, v. STAR-CHRONI-CLE PUBLISHING COMPANY.

### In Banc, November 12, 1910.

1. **ABSTRACT: Matters of Record and Exception: How Pre-served.** The petition, a demurrer thereto, and the order over-ruling the demurrer, are all matters of record, and need no mo-tion for a new trial to preserve them for review (unless de-fendant by answering over waived the demurrer) and have no place in the bill of exceptions, and if preserved therein only cannot be reviewed on appeal. On the other hand, the motion for a new trial, and the exception to the court's ruling thereon, are matters of exception, have no place in the record proper, and cannot be reviewed on appeal if preserved therein only; but the record showing the filing of the motion and the court's ruling thereon are parts of the record proper and should be set out as record matters in the abstract.

2. **LIBEL: Petition: No Cause of Action Stated.** The petition charged that defendant printed and published in its newspaper "the following false, defamatory and libelous article or language of and concerning plaintiff: 'Is he the same coroner? Isn't Coroner Julius C. Baron, present incumbent and candidate for re-election, the public official who joined with the police in letting Health Commissioner Bond's chauffeur go free, without bond or charge or investigation, after the latter had run down and killed a little child in the street, and if he is, would this be a good reason for continuing his term of service? Voters, with or without children, who think there should be an inquiry into the mangling of such little tots, please answer at the polls.' That this plaintiff was the chauffeur to whom defendant re-ferred in said publication, and that by said publication defend-ant thereby meant to charge this plaintiff with a crime involv-ing moral turpitude, and with having willfully and wantonly taken the life of a human being. That said publication was willful and malicious, and he has been damaged," etc. *Held*, that the petition did not state a cause of action for libel.

3. ———: ———: **Demurrer Lies.** In spite of the fact that the Constitution says that, in libel, "the jury, under the direction of the court, shall determine the law and the fact," a demurrer lies to a petition sounding in tort for libel the same as to any other petition.

4. ———: ———: **Libelous of Another.** A party cannot support a charge of libel by showing that the same publication libeled

another. The malice to support the charge must flow from defendant to plaintiff and be personal to him, whatever it may be towards the other.

5. ———: ———: **Context: Kill and Mangle.** All parts of a publication must be read together to collect the true meaning; and where the publication states that a chauffeur "had run down and killed a little child in the street" and there "should always be an inquiry into the mangling of such little tots," these words should be read in connection with their context, and when that is done they suggest an automobile, which is not a lethal weapon, like a gun, and no evil intent to kill or harm is presumed by its mere use, but the words used naturally suggest death by negligence or accident, and therefore the conclusion in the petition that defendant meant to charge plaintiff "with having willfully and wantonly taken the life of a human being" is an unnatural and strained construction and cannot in law be held to so mean. The word "killed" therein only means that the child was deprived of its life by a collision.

6. ———: ———: **Veiled: Attitude of Courts: Unambiguous Words.** Courts no longer construe words in their most favorable and mild sense when an offensive or libelous sense may be fairly deduced from the trend of the publication. The law will be as astute to reach and cure as is the libeler to hide, adroitly veil and do harm. On the other hand, courts will not hunt for a forced and strained construction of the words used, nor will they permit a witness to testify that the words conveyed to him the idea of a felonious taking of a human life, when they are not ambiguous and that idea is not their natural, honest or generally understood meaning; and when that is the case, there is nothing for the jury to pass on.

7. ———: **Freedom of Speech.** Freedom of speech is guaranteed to the individual and newspaper by the Constitution, and courts are charged with the duty to see that it is not abridged. A newspaper may comment fairly, freely, with vigor and severity, on any matter of public concern, and especially the public acts of public officials, and if the freedom is not abused by the use of malicious, false or defamatory words, the publication is qualifiedly privileged.

8. ———: ———: **Coroner: Qualifiedly Privileged.** The office of coroner involves the duty of investigating the causes of sudden, violent and unnatural death; and a publication which calls attention to the fact that a child was killed in the public street by an automobile driven by plaintiff and that no investigation was made into the matter by the coroner, and inquiring whether or not plaintiff was permitted to go free because he was the chauffeur of another public officer, is primarily directed at the coroner, and is a reasonable comment and qualifiedly privileged.

Appeal from St. Louis City Circuit Court—*Hon. Chas. C. Allen,* Judge.

AFFIRMED.

*Robert & Robert* for appellant.

(1) Where the words complained of as libelous are susceptible of two meanings, one harmless and the other defamatory, the jury must determine in which sense the readers may have understood them. Constitution, art. 2, sec. 14; Julian v. Star Co., 209 Mo. 35; McGinnis v. Knapp, 109 Mo. 131; Caruth v. Richardson, 96 Mo. 190; Johnson v. Dispatch Co., 2 Mo. App. 569; Feder v. Herrick, 43 N. J. L. 24; Publishing Co. v. Jones, 83 Tex. 302; Odger's Libel and Slander, secs. 23, 306. (2) The amended petition states a cause of action for libel *per se,* as the publication charged the plaintiff with the commission of a crime and held him up to public scorn. R. S. 1899, sec. 2259; R. S. 1899, secs. 1815, 1816, 1817, 1835, 2375; Meriwether v. Knapp, 224 Mo. 617; Julian v. Star Co., 209 Mo. 35; Minteer v. Bradstreet, 174 Mo. 485; Noenninger v. Vogt, 88 Mo. 589; Ferguson v. Pub. Co., 72 Mo. App. 462; Herman v. Bradstreet, 19 Mo. App. 229; Pub Co. v. Smith, 149 Fed. 704; O'Shaughnessy v. Recorder Co., 58 Fed. 653; Holt v. State, 89 Ga. 316; Poole v. State, 87 Ga. 526; Clark Crim. Law (2 Ed.), 186; 1 Whart., Crim. Law, 329. (3) The word "killed" imputed to the plaintiff the crime of murder and is actionable *per se.* Jones v. Murray, 167 Mo. 25; Noenninger v. Vogt, 88 Mo. 589; Button v. Hayward, 8 Mod. 24; Cooper v. Smith, 1 Rolle's Abr. 77; Doan v. Kelley, 121 Ind. 43; O'Connor v. O'Connor, 24 Ind. 214; Thomas v. Blaisdel, 147 Mass. 438; McLaughlin v. Cowley, 131 Mass. 70; McLaughlin v. Cowley, 127 Mass. 316; Publishing Co. v. Jones, 83 Tex. 302; Curley v. Feeney, 67 N. J. L. 70; Carroll v. White, 33

Barb. 615; Hays v. Hays, 1 Humph. 402; Cady v. Times Co., 58 Minn. 329; Palmer v. Smith, 21 Minn. 419; "Killer," Webster's Dictionary and Century Dictionary.

*Nathan Frank* and *Richard A. Jones* for respondent.

(a)    At the outset of every libel proceeding, if the sufficiency of the matter charged in the petition to constitute a cause of action is challenged, it is properly within the scope of the functions of the court to determine this, even though it may involve an inquiry as to the quality of the publication, whether defamatory or otherwise. Heller v. Pulitzer Publishing Co., 153 Mo. 213; Duncan v. Williams, 107 Mo. App. 541.    (b)    In arriving at the sense in which alleged libelous words are employed, the entire language used must be considered in determining this, and whether there is contained therein a defamatory charge. Hall v. Adkins, 59 Mo. 144; Trimble v. Foster, 87 Mo. 49.    (c)    The most that can be derived from the publication upon which appellant bases his action is that a coroner—a candidate for re-election—while holding such office, failed to make investigation concerning the happening of a casualty resulting in death. That a child had been run over by an automobile, and the person operating the machine which caused such death was released from responsibility without inquiry on the part of the coroner to determine whether any existed or not. The publication then suggests that those voters who think there should always be an inquiry into such casualties should cast their ballot accordingly. The publication has reference solely to the coroner's failure to make inquiry as to the circumstances surrounding casualties resulting in death. It does not charge that if such investigation had been made, it would have resulted in fixing upon the chauffeur described any improper ac-

tion or delinquency, much less attribute to such person the crime of murder, as is suggested in the pleading and brief of appellant. The publication is not libelous. It does not contain a charge of a defamatory character as against appellant, does not attribute to him any delinquency or misconduct, legal or moral, and the trial court rightfully held that no statement was contained in the matter complained of which constitutes a cause of action in favor of appellant. Spurlock v. Investment Co., 59 Mo. App. 225; Baldwin v. Walser, 41 Mo. App. 243; Legg v. Dunleavy, 80 Mo. 558, 10 Mo. App. 461; Branch v. Knapp & Co., 222 Mo. 580; Blackwell v. Smith, 8 Mo. App. 43; Christal v. Craig, 80 Mo. 367; Salvatille v. Ghio, 9 Mo. App. 155; Wood v. Hilbish, 23 Mo. App. 389; Klos v. Zahorik, 113 Iowa 161; Barr v. Pub. Co., 27 R. I. 101; Curry v. Collins, 37 Mo. 324; Brown v. Tribune Assn., 77 N. Y. Supp. 461; Foot v. Pitt, 82 N. Y. Supp. 464; Ramscar v. Gerry, 1 N. Y. Supp. 635; Kilgore v. Evening Star, 96 Md. 16; Hollenbeck v. Hall, 103 Iowa 214; Homer v. Co., 98 Mich. 506; Edwards v. Chandler, 14 Mich. 471; Bearce v. Bass, 88 Me. 521; Denneback v. Tribune Ptg. Co., 108 Mich. 75; Brown v. Boynton, 122 Mich. 251.

LAMM, J. —Tort for libel. Cast on demurrer to his original petition, plaintiff plead over. Cast on demurrer to his amended petition, he stood, refused to plead over, suffered judgment, filed a motion for a new trial, excepted to the order overruling the same, had his bill of exceptions settled, allowed and filed, and came up on appeal.

The amended petition reads:

"Now comes Joseph Diener, plaintiff in the above entitled cause, files this amended petition, and for his cause of action states that the defendant, Star-Chronicle Publishing Company, is and was at all times hereinafter mentioned, a corporation duly organized and existing under the laws of the State of Missouri. That

at the time hereinafter mentioned said defendant was the publisher, proprietor and printer of a certain daily newspaper of large circulation in and about the city of St. Louis, which said newspaper is published in the city of St. Louis, State of Missouri, and is known as the 'St. Louis Star-Chronicle.'

"That on, to-wit, the first day of November, 1906, there was printed and published in said newspaper the following false, defamatory and libelous article or language, of and concerning the plaintiff, to-wit:

" 'Is He the Same Coroner?

" 'Isn't Coroner Jules C. Baron, present incumbent and candidate for re-election, the public official who joined with the police in letting Health Commissioner Bond's chauffeur go free, without bond or charge or investigation, after the latter had run down and killed a little child in the street, and if he is, would this be a good reason for continuing his term of service? Voters, with or without children, who think there should always be an inquiry into the mangling of such little tots, please answer at the polls.'

"That at all times referred to in said publication, the plaintiff was the chauffeur of Health Commissioner Bond, which fact the defendant well knew, and that this plaintiff was the chauffeur to whom the defendant referred in said publication, and that by said publication, defendant thereby meant to charge this plaintiff with a crime involving moral turpitude, and with having willfully and wantonly taken the life of a human being.

"Plaintiff further states that said publication was willful and malicious, and that he has been damaged thereby in the sum of ten thousand dollars.

"Wherefore, plaintiff prays judgment in the sum of ten thousand dollars, together with his costs."

The demurrer reads:

"Comes defendant, Star-Chronicle Publishing Co.,

and demurs to the amended petition of plaintiff filed in the above entitled cause, for that:

"The matter and things stated and charged therein are not sufficient to constitute a cause of action against this defendant."

I.  Plaintiff assumed to preserve his petition, the demurrer, the ruling sustaining it, his exception thereto, a motion for a new trial and his exception to overruling the latter, *in a bill of exceptions.* Fortunately, it happens in this instance that no harm came to him by that course. This, for the reason that the record proper, brought up in his abstract, also preserved such matter and his point.

But inadvertence in the use of rules of practice results in cases riding off on appeal without a disposition of the merits. In this view, caution is better than cure, as the precept puts it. Therefore, it is wise to stamp out heresies, to put up signs at the point of divergence from the beaten path. (*Via trita est tutissima,* 10 Coke 142.) To illustrate, if the ruling on the demurrer, the demurrer itself and the trial petition had been preserved nowhere else than in a bill of exceptions, this appellant would have nothing here to review; for if anything is settled it is that such matter has no place in a bill of exceptions. It is part of the record proper, and if it appear only in such bill it is the same as if it did not appear at all.

The rules to go by are:

(a)  A demurrer is part of the record proper. It must appear there. It needs no bill of exceptions to preserve it. The ruling on it is likewise a part of the record proper, and no exceptions are necessary to have that ruling reviewed (provided error on the demurrer is not waived by pleading over). [Spears v. Bond, 79 Mo. l. c. 469; City of Tarkio v. Clark, 186 Mo. l. c. 293-4; Mallinckrodt Chem. Works v. Nemnich, 169 Mo. l. c. 395.]

(b)   It results, as a sequence, that a motion for a new trial is not necessary in order to review the ruling on a demurrer, since that motion is directed to matters of mere exception.   And so we have ruled over and over.   [Hannah v. Hannah, 109 Mo. 236; Dysart v. Crow, 170 Mo. 280; McKenzie v. Donnell, 151 Mo. l. c. 448; Thorp v. Miller, 137 Mo. l. c. 238-9.] *Vide,* Houtz v. Hellman, 228 Mo. 655.

So much to show disapproval of the plan of plaintiff to keep life in his point by a motion for a new trial, and by a bill of exceptions.

This brings us to the real question in the case, which is:

II.   Does the amended petition state a cause of action?  We think not, because:

(a)   A demurrer lies to a petition sounding in tort for libel the same as to any other petition, if certain conditions are present—this, in spite of the constitutional provision (art. 2, sec. 14 of the Bill of Rights) that, in libel, "the jury, under the direction of the court, shall determine the law and the fact."  To illustrate:

If A sue B for libel without matter of innuendo or inducement, on the theory that the words published are libelous *per se,* and they are not libelous *per se,* the sufficiency of A's petition may be challenged by demurrer, and is for the court.

Again, if A sue B for libel for words not actionable *per se* and the pleader, claiming they bear a hidden or latent libelous meaning because of certain extrinsic circumstances, sets such extrinsic circumstances forth by prefatory allegations by way of inducement and follows up the libelous words by an innuendo applying the words to the matter so pleaded by way of inducement, in such case, such innuendo should not be a forced and unnatural construction and application of the words, but a reasonable and natural construc-

tion and application of them. A vice of that sort can be reached by demurrer, and is for the court.

Again, if the words of the libel are ambiguous and the pleader can only put a libelous tang or edge upon them by a wholly unnatural and forced construction and tries to do so by an innuendo, that vice can be reached by demurrer, and is for the court.

So, if the petition be not challenged by way of demurrer, *in limine,* and the case be fully developed on trial, and if, under the pleadings and evidence no case is made, the court may take the case from the jury by a peremptory instruction in the nature of a demurrer.

So far as above indicated, libel suits, though *sui generis* (in a sense) are subject to those rules of practice found wise and useful in administering justice generally in the courts.

The propositions just ruled lie well within the holding and reasoning of Heller v. Pulitzer Pub. Co., 153 Mo. 205; Ukman v. Daily Record Co., 189 Mo. l. c. 390, and the fourth proposition discussed in the Ukman case, l. c. 393 *et seq.,* and cases and text-books cited; Branch v. Knapp & Co., 222 Mo. l. c. 587-7; Bank v. Henty, L. R. 7 App. Cas. (H. L.) 741. And the student in jurisprudence, curious in that behalf, may find in those cases and authorities the reasoning supporting those propositions.

It may not be amiss, in passing, to borrow and quote a bit of wisdom anent demurrers in libel and slander from a very good authority. Henry Lord Cromwell brought suit for slander against Denny, a vicar, in the King's Bench during the time of Queen Elizabeth. [Lord Cromwell v. Denny, 4 Coke 12b.] In commenting on that case, Sir Edward Coke quaintly says: "In this case, reader, you may observe an excellent point of learning in actions for slander, to observe the occasion and cause of speaking of them, and how it may be pleaded in the defendant's excuse. When the matter in fact will clearly serve for your client, al-

though your opinion is that the plaintiff has no cause of action, yet take heed you do not hazard the matter upon a demurrer; in which, upon the pleading, and otherwise, more perhaps will arise than you thought of, but first take advantage of the matters of fact, and leave matters in law, which always arise upon the matters in fact *ad ultimum,* and never at first demur in law, when after the trial of the matters in fact the matters in law (as in this case it was) will be saved to you.''

But having regard to the dangers of a demurrer suggested by that profound lawyer and the precept that abundant caution does no injury, we think the propositions heretofore announced are accepted modern doctrine; and they may be taken as not a little fortified by another settled proposition, *viz.,* that it is for the court and not the jury, or the pleader, to determine by judicial construction the legal effect and force of the terms of a written instrument, provided those terms are unambiguous and are set forth in the petition as the foundation of the cause of action. [Donovan v. Boeck, 217 Mo. 70.] It follows that a demurrer which admits the fact of publication and the words used, does not admit an unfair and forced construction put upon the words by the pleader.

We are not saying that a court, as a matter of law, can by instruction declare a given publication libelous. Such power is denied by our Constitution. But we are saying that a court, in a given case, may declare it not libelous as a matter of law. In libel a defendant has two strings to his bow, the court and the jury; plaintiff but one, the jury. Such is the doctrine of the Heller, Ukman and Branch cases, supra.

In so far forth, then, as learned counsel apparently argue that it was for the jury by their verdict, and not for the court by its ruling on a demurrer, to dispose of the questions discussed on the demurrer, we disallow the argument.

(b)   It will be observed that enough appears in the alleged libelous article to show that a political campaign was in progress. Indeed, from the date of the article, November 1, 1906, we judicially know that under our statutes a general election was pending and that a candidate for coroner must have been theretofore nominated, if at all. The article deals primarily and broadly with that election and with the candidacy of Doctor Baron for re-election to that office. It is addressed to the body of the voters of the city of St. Louis in a matter of public concern. It is couched in the form of argumentation by interrogation, a method of persuading and convincing respectably vouched for by no less authority than Socrates himself, as we are told by his pupil, Plato, *viz.*, that of asking questions adroitly framed to suggest the answer and to put those who sensibly answer them in the attitude of establishing the propositions the questioner hopes to maintain and establish.

This case was argued at our bar with another, where the same plaintiff sues the same defendant on another alleged libel relating to the same casualty. We are referred by briefs to the record in that case. Going there, we find that an article appeared in defendant's newspaper in May, 1906, complaining of Doctor Baron, as coroner, for his conduct in and about the investigation of the death of a little girl, Gertrude Copeland, who, the article says, was torn to pieces by the automobile of Health Commissioner Bond, driven by plaintiff as chauffeur. We stand informed then, by express consent of counsel, that the article in hand refers to that tragedy and the conduct of the coroner at the time. It wants to know if Doctor Baron is the same coroner who let the chauffeur "go free without bond or charge or investigation after the latter had run down and killed a little child in the street." It asks the the voters of St. Louis whether, if Doctor Baron be the same coroner, this would be a good reason

for re-electing him. It proceeds on the assumption that all voters, those having children and those having none, who think there should always be an official inquiry (before the coroner plants himself as in favor of a chauffeur) when little children are mangled by automobiles, should answer a certain question at the polls, *viz.*, whether a coroner, who does not live up to such rule of official conduct, should be continued in office. The libelous poison, as to the plaintiff, is said to lurk in the phrase, "run down and killed a little child in the street," and the other, "the mangling of such little tots." It is charged by way of innuendo that "defendant thereby meant to charge this plaintiff with a crime involving moral turpitude, and with willfully and wantonly taking the life of a human being."

The question then narrows itself and comes to be: Whether the article is libelous *per se* as to the chauffeur, or will reasonably bear the innuendo and construction put upon it by the pleader.

In expounding the matter certain settled propositions of the law of libel must be reckoned with, *viz.*:

*First.* A party cannot support a charge of libel by showing that the same publication libelled another. To make a case, the publication must be libelous as to the plaintiff, not another. The malice supporting the charge must flow from defendant to plaintiff and be personal to him alone and not another.

Speaking to the point, FOSTER, J., in Bearce v. Bass, 88 Me. l. c. 542, said: "If, therefore, the defendants' criticism of the plaintiffs' work was fair and reasonable, and had no reference to their private or business character, and there was no proof of actual malice on the part of the defendants towards the plaintiffs, then, however much malice may have existed between the defendants and Mr. Beal" (another party criticised) "cannot make the defendants' criticism libelous. If the criticism of the defendants was fair and reasonable and in reference to a matter of pub-

lic concern, and the plaintiffs are not attacked either in their private or business reputation, then it constitutes no libel because not defamatory; and it cannot be made libelous by any attack upon the private or business reputation of some person other than the plaintiffs, no matter to what extent such malice may exist. [Odgers on Libel, 39, 268; Newell on Libel, 324.]"

So, in this case we are not concerned with a libel on Baron that may or may not lurk in the comments made on his official acts, as bearing on his worthiness as a candidate for re-election. Baron is not suing here and the plaintiff cannot recover because the article is censorious of him. In libel every tub stands on its own bottom.

*Second.* Since one part of a publication may explain another part, and since the intent and the meaning must be gathered not only from the words singled out as libelous but from the context, the maxim, *Noscitur a sociis*, applies; and (broader yet) all parts of the publication must be read together to collect the true meaning. Phrases and words must not be singled out and wrenched from a context explanatory or indicative of the meaning. The whole article is its own best interpreter. So, words take color from the occasion of speaking them.

In Kilgour v. Evening Star, 96 Md. l. c. 27, it was said: "In the opening sentences of the publication, it is stated that many prominent citizens were greatly agitated, 'on account of the alleged stifling by the State's Attorney of an investigation of the mysterious death, etc.,' and it is insisted that the word 'stifling' was used in its offensive sense, and implied that the State's Attorney acted from corrupt motives. But we cannot accept this view if the whole article be considered, as must be done if we are to arrive at the true meaning and force of particular words or phrases.

It is not proper to separate words or phrases from the context. All parts of the paper should be read in connection, to collect their true meaning.'' [Gaither v. The Advertiser Co., 102 Ala. 458; Donaghue v. Gaffy, 53 Conn. 43.]

It is from such rules that the related one is deduced, *viz.,* that if the omission of any part of the libelous publication from the pleading makes a material alteration in the sense, the omission is fatal. [Meriwether v. Knapp & Co., 211 Mo. l. c. 209.] Therefore, in this case the word ''killed'' and the word ''mangled'' must be considered in the light of the context. Attending to the context, we find the word ''chauffeur'' used and the phrase ''run down.'' Now, a chauffeur is the driver of a heavy self-propelled vehicle plying on the public streets and capable of great speed—a vehicle propelled by internal combustion engines, steam engines or electric motors, one well calculated to give joy and comfort to its occupants, but abounding in danger and terror to pedestrians. But an automobile is not a lethal weapon like a gun, a pistol, a dagger or a billy. Hence no evil intent to kill or harm is presumed by its mere use. It does not fill the malignant office of poison in taking life. If it take the life of, or mangle, a child or adult, it is by means of a collision, through negligence or accident. In other words, it runs them down. Appellant's counsel cite us to cases of doctors suing for libel because of publications accusing them of killing their patients—a tender point; to others where the libel consists in a charge of killing a pupil by corporal punishment, or a slave in like manner; to other old cases where the bald charge was made of killing, without any explanation of instrument, means or occasion. [1 Rolle's Abridgment 77.] But none of those cases are in point. At any rate, we shall not follow them here where a form of the verb ''to kill'' is not used in a connection showing it means to charge a crime.

*Third.*  Libel may lurk in ironical words. (Witness, the funeral oration of one Marcus Antonius on a notable occasion.)  It may lurk in a *double entente,* as in the case put by Rabelais: "The devil was sick, the devil a monk would be, The devil was well, the devil a monk was he."

It may lurk in questions so framed as to indicate the affirmance of a fact though that affirmance be adroitly veiled.  The law may well be as astute to reach and cure as is the libeler to hide and do harm.  Courts no longer construe words in their most favorable and mild sense when an offensive and libelous sense may be fairly deduced from the trend of the publication, indirectly by sarcasm, invective and abuse, or by direct statement.  Otherwise, as put by Lord Chief Justice DE GREY, in *Rex* v. Horne—a case of profound interest to our Revolutionary fathers and students of history—1 Cowper (American Reprint) l. c. 348: *"A man might defame in one sense and defend in another."*  "Words are now construed by courts as they always ought to have been, in the plain and popular sense in which the rest of the world naturally understand them," (*per* ELLENBOROUGH, C. J., in Roberts v. Camden, 9 East l. c. 96).  But while courts will not bother themselves to hunt for the mildest sense to be put upon his words, to find a loophole of escape for the libeler by construction, neither will they hunt for a forced and strained construction to put  upon them, but they will be construed fairly by their natural import, according to the ideas they were calculated and intended to convey to those to whom they were addressed, and pinned down to some one commonly accepted meaning, one generally understood—mindful always that language is as significant in suggestion as in expression, that a libelous charge may be sprung by insinuation, and that defamation begins where honest criticism leaves off.

Bringing the alleged libelous publication to book,

is there any sarcasm or abuse or irony in a bad sense? None whatever. The force of the publication is leveled and spent at the coroner and his dereliction of duty— not at the chauffeur. The aim and purpose of the writer is entirely fair and honest, without any badge of malice. It is to inculcate and accent the idea and duty of an immediate and drastic investigation when a child is killed by an automobile. The chauffeur is brought in merely as an incidental factor to identify the transaction concerning which the coroner is criticised. The writer could not have said much less about the chauffeur than he did if the point he was making against the coroner and the moral he sought to draw were to be comprehended by the reader. To be sure, he might have used daintier language and put his screed into a softer or more roundabout form. He might have said the child was overtaken by an automobile and came to its death thereby, or its death was caused thereby, or that its death ensued, or that it gave up the ghost, etc. But those forms of expression would have lacked nervous force and pith. Instead, he used the word "killed." Is there anything fairly ambiguous in that word—any sign that the writer was paltering in a double sense? Or meant anything more than it was deprived of life? None that we can see. The kernel of the thing is, after all, that if the child died as the result of the collision, it was "killed" thereby. Such is the long and short of it, and the only fair import of the word, taken with its context.

Under such circumstances the court would not allow the testimony of any witness to the effect that the word conveyed to him, as a reader, the idea of a felonious taking of a human life. A construction of that sort would be forced and strained, not natural and reasonable. Neither was there anything for a jury to pass on by way of putting a libelous meaning or edge on the word "killed." This conclusion is within the doctrine of the Heller, Ukman and Branch cases, supra;

nor does the Julian case, 209 Mo. 35, aid plaintiff. The language in judgment in that case, "did well in a legislative way," was construed to be ambiguous, one natural sense of it being libelous. In such case, the doctrine applies that the apprehension of the reader is the touchstone of interpretation. It was happily said by GOODE, J., in a case on which I cannot put my finger, that in this aspect a libel or slander is like unto a jest —i. e., the prosperity of each lies in the ear of the hearer—thus hitching the gravity of the law to the car of the light philosophy of Rosaline:

"A jest's prosperity lies in the ear

Of him who hears it, never in the tongue

Of him that makes it." (Love's Labour's Lost, Act V., Sc. 2.)

*Fourth.* Finally, freedom of speech is guaranteed to the individual and newspaper by the Constitution. Courts are charged with a duty they may not pretermit, to see to it that it is not abridged. It is, however, the use and not the abuse of free speech and free press that is guarded by the fundamental law as sacred. So long as a publication is not directed to a public officer by charging corruption or other criminal misfeasance or non-feasance, so long as it is not directed to the defamation of an individual in his private character or business, but is directed to a matter of live public concern and is for an honest and not a defamatory purpose, it is qualifiedly privileged. Within lines suggested, it would be intolerable to hold that a newspaper or individual—the one the same as the other—might not comment fairly, freely, with vigor and severity. "Everyone has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose, however severe in their terms, unless they are written intemperately and maliciously. Every citizen has full freedom of speech on such subjects, but he must not abuse it. . . . . The right to comment upon the

public acts of public men is the right of every citizen, and is not the peculiar privilege of the press. . . . . Every one of the public is entitled to pass an opinion on everything which in any way invites public attention." [Odgers, Libel and Slander, 34-36.] Such is the universal rule in this vital matter. [Bearce v. Bass, 88 Me. supra; Branch v. Knapp & Co., supra; Triggs v. Sun Printing and Pub. Assn., 179 N. Y. 144.] And see an illuminating article by Van Vechten Veeder in 23 Harvard Law Review, p. 413.

The right of freedom of speech, of fair comment with an honest purpose in matters of public concern, is on the foot of *pro bono publico* and founded on public policy. Free discussion is the foundation on which free government itself is builded. That lost, all is lost —the two exist or perish together. They mean the same thing. It is only in despotisms that one must speak *sub rosa,* or in whispers with bated breath, around the corner, or in the dark, on a subject touching the common welfare. It is the brightest jewel in the crown of the law to seek and maintain the golden mean between defamation on one hand and a healthy and robust right of free public discussion on the other.

The office of coroner is of great antiquity and dignity. The power of that office at common law involves the duty of investigating the causes of sudden, violent and unnatural deaths. [7 Am. and Eng. Ency. Law (2 Ed.), p. 602.] "The most important function of the office of coroner is that of holding inquests as to the causes of violent and extraordinary deaths." [*Ibid.,* p. 603.] His common law powers are also declared by statute. "A coroner . . . . shall take inquests of violent and casual deaths happening [in his county] or where the body of any person coming to his death shall be discovered in his county." [R. S. 1899, sec. 6629.] Another section (6633) refers to his duty to investigate when he is notified of the dead body of any

person "supposed to have come to his death by violence or casualty."

We shall not hold that the death of a child on the public street, killed by an automobile, is not a matter of intense interest to the public. The injury of one, in that behalf, is truly the concern of all. We shall not hold that the act of a coroner in releasing the chauffeur or in refusing an inquest at the outset, to locate the blame, if any, for such a casualty, is not the proper subject for animadversion by any public print in an article couched in the terms of that complained of, when the chauffeur who drove the machine is referred to as having run down and killed the child.

The article being fair and with an honest purpose, in no wise ear-marked with abuse and vituperative indications of malice, it was privileged as a matter of law. We hold it was not libelous *per se;* and that the innuendo pleaded was a forced and strained one.

The ruling on the demurrer was well enough. Let the judgment be affirmed. It is so ordered.

The case came into Banc on a dissent from the foregoing divisional opinion. In Banc on a rehearing it was adopted by a majority of the judges, *Valliant, J.,* concurring in the result; *Gantt, Graves* and *Kennish, JJ.,* concurring in full; *Woodson, J.,* dissenting; *Burgess, C. J.,* absent.