LYNCH v. STANDARD PUBLISHING CO. et al.

No. 3123.   Decided January 24, 1918.   (170 Pac. 770.)

1. LIBEL AND SLANDER—SEPARATE NEWSPAPER ARTICLES—CONSIDERA-TION AS ONE. In an action for libel, separate newspaper items complained of, for the purpose of testing the sufficiency of plaintiff's complaint, may be treated and regarded as one connected statement, though they appeared as separate articles and in different columns of defendant's newspaper. (Page 331.)

2. EVIDENCE—JUDICIAL NOTICE—MATTER OF COMMON KNOWLEDGE—NEWSPAPER PUBLICATIONS. It is a matter of common knowledge that in newspaper publications news items of importance and of general interest to the public are frequently taken up, discussed, and commented upon editorially in the same issue of the paper. (Page 331.)

3. LIBEL AND SLANDER—NEWSPAPER PUBLICATION—NONDEFAMATORY CHARACTER. Where a newspaper published an announcement of a legislative appropriation to investigate the affairs of state offices, and that the Governor, pending investigation, had suspended certain officers, including the secretary of the state land board, for their alleged failure to give necessary assistance to the investigators,

and also published an editorial enlarging on the theme of its first paragraph, which read: ''With the beginning of the state investigation at the capitol, it becomes evident startling disclosures are to be made. Men are to go down in shame who should have remained respected citizens by obeying the moral code and the law of the state''—such publications, construed together, were not defamatory of the secretary of the state land board, and could not directly or by proper innuendo be held to apply to any particular officers or class of officers of the state. (Page 331.)

4. LIBEL AND SLANDER—REFERENCE TO ASCERTAINED OR ASCERTAINABLE PERSONS. Before defamatory newspaper articles are actionable, they must refer to some ascertained or ascertainable person, who must be the person complaining, shown to be such by being directly named or so intended from the extrinsic facts and circumstances. (Page 332.)

5. LIBEL AND SLANDER—INNUENDO. Where the words used in alleged libelous newspaper articles were plain, ordinary English words having no particular significance, no innuendo was essential to determine their meaning. (Page 322.)

6. LIBEL AND SLANDER—MEANING OF LANGUAGE EMPLOYED—QUESTION FOR COURT. In an action against a newspaper for libel, it was for the court to say whether the language used or words employed in the articles complained of were susceptible of the meaning attached to them by the allegations of the innuendo of the complaint. (Page 322.)

7. LIBEL AND SLANDER—DEFAMATORY MATTER—APPLICATION. Where defamatory matter has no special application and is so general that no individual damages can be presumed, and the class referred to (as all state officers that may be found on investigation to have been derelict in their duties) is so numerous that great vexation and oppression might grow out of a multiplicity of suits, no private suit for libel can be maintained. (Page 322.)

Appeal from District Court of Weber County, Second District; *Hon. A. W. Agee,* Judge.

Action by William J. Lynch against the Standard Publishing Co., Frank A. Francis and Roscoe C. Glassman.

Judgment dismissing the complaint. Plaintiff appeals.

AFFIRMED.

*Barnes & Iverson* for appellant.

*J. D. Murphy* for respondent.

### RESPONDENT'S POINTS

While we submit that no other conclusion can be reached, upon reading the statements of the editorial in connection with the news statements, that it was charged with all possible positiveness that state officials had been guilty of wrong; had betrayed their trusts; were embezzlers; and that the plaintiff in this case was one of those charged; yet we further submit that in order to maintain this action for libel it is not necessary that the charge should be direct and positive, but that the imputation may be inferred, and, if it can be reasonably said that such imputation may be inferred, then the action will lie.

"Insinuations may be defamatory as direct assertions, since the effect and tendency of the language used and not its form is the criterion." (25 Cyc., page 360; *Palmerlee* v. *Nottage,* 119 Minn. 351; 138 N. W. 312; 42 L. A. R. [N. S.] 870.)

We submit that it cannot be said as a matter of law that the article complained of is not libelous.

"It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in that defamatory sense that the court can rule, as matter of law, that the publication is not libelous." *(Robinson* v. *Coulter,* Mass. 102 N. E. 938; *Twombley* v. *Monroe,* 136 Mass. 464.)

That an alleged libel is true or qualifiedly privileged is a matter of defence and cannot be availed of on demurrer to the declaration. *(Robinson* v. *Coulter,* supra.)

If the article complained of is libelous as to some person or persons, then we submit that the complaint sets out a cause of action against the defendants for it will establish that it is not necessary that the plaintiff should be named in the alleged libelous article. (25 Cyc. 362; *Fenstermaker* v. *Tribune Publishing Co.,* 12 Utah 439; 43 Pac. Rep. 112; *People* v. *Ritchie,* 12 Utah 180; 42 Pac. Rep. 209; *Van Ingen*

v. *Publishing Co.*, 35 N. Y. Supp. 838; 50 N. E. 979; *Publishing Co.* v. *Orsborn*, [Texas] 151 S. W. 574; *Barron* v. *Smith*, [S. D.] 101 N. W. 1105.) Where a libel does not name the plaintiff, he may give evidence of all the surrounding circumstances and other extraneous facts which will explain and point out the person to whom the allusion applies. (25 Cyc. 493; *Van Ingen* v. *Publishing Company*, supra; *Dennison* v. *Publishing Co.*, 82 Nebraska 675; 118 N. W. 568; 23 L. R. A. [N. S.] 362.) And in order to make such proof opinions of witnesses may be given to identify the persons referred to. (25 Cyc. 493; *State* v. *Mason*, 26 Oregon, 273, 38 Pac. Rep. 130; 26 L. R. A. 779; *Dennison* v. *Publishing Company*, supra; *People* v. *Ritchie*, supra; *Fenstermaker* v. *Tribune Publishing Co.*, supra.)

CORFMAN, J.

The appellant brought an action to recover damages alleged to have been sustained by him by reason of certain alleged false and defamatory matters appearing in the Ogden Standard, a newspaper published at Ogden, Utah, and having a general circulation throughout the state of Utah, of which the respondent the Standard Publishing Company, a corporation, was the owner, and Frank A. Francis and Roscoe C. Glasmann were the editors. The articles complained of appeared in an issue of the *Ogden Standard* published and circulated under date of February 16, 1917, and consisted of: First, a news item appearing in one column; and, second, an editorial in another. The complaint, after setting forth by way of inducement that appellant was a state officer, to wit, a duly appointed, qualified, and acting member and secretary of the state board of land commissioners of the state of Utah, alleged the character and responsibilities of his duties as such and that the publications were intended to and did apply to him. To the complaint respondents filed a general demurrer, which, upon a hearing, was sustained. Appellant elected to stand upon his complaint, and therefore judgment of dismissal was made and entered by the court, from which this appeal is taken.

Before proceeding to discuss and pass upon the sufficiency of the demurrer, we shall set forth the newspaper articles as they are alleged in the complaint, to wit:

"That in an issue of the said newspaper issued, published and circulated, as aforesaid, by the said defendants on the 16th day of February, 1917, the said defendants did compose, print and publish and cause and procure to be published therein as alleged news statements and items concerning and regarding this plaintiff the following publication:

" 'Salt Lake, Feb. 16.—Governor Simon Bamberger yesterday suspended William J. Lynch, secretary of the state land board, and Fred W. Chambers, state fish and game commissioner, from their offices until such time as an investigation of the affairs of both their offices are completed.

" 'It was intimated by the Governor that further suspensions are to take place and that any state employee or appointee who interferes in any way with the conduct of the investigation would meet summary treatment.

" 'The suspension of the two state officials following close upon the heels of the passage of the bill which appropriated $25,000 for the purpose of conducting an investigation into the affairs of the different state departments and into the state institutions. The bill was passed by the House and Senate under suspension of the rules and signed by the Governor and became a law in less than two hours and thirty minutes.

" 'While neither Mr. Lynch or Mr. Chambers would comment on the action of the Governor it was learned last night that neither intend to give up their offices under the suspension orders of the Governor.

" 'It may be that the measure passed yesterday will find its way into the Supreme Court for a test at once. Governor Bamberger declared that he intended to carry out the provisions of the law and keep the two officers suspended until a full investigation of the affairs in the two departments is had. It was predicted by former state officials that a fight would be made on the suspension order.

" 'Not more than twenty minutes after the signing of the

bill the Governor issued a peremptory order suspending Mr. Lynch as secretary of the state land board, and Mr. Chambers as fish and game commissioner.

" 'Brown Placed in Charge.

" 'F. D. Brown, who has been conducting the investigation into the affairs of the state land board, has been placed in charge of the affairs of the land board until such time as the audit of the books and the investigation is completed. He was auditing the books of the state land board since January 15, when he was sent to that department by Governor Bamberger. No one has been placed in charge of the fish and game department, and it was announced yesterday that none would be assigned to the department until some time today.

" 'Governor Bamberger announced last night that F. D. Brown would be made the chief investigator for the Governor's office so far as the auditing of the books of the various state departments and state institutions are concerned. He will be assisted by Arthur Kuhn of Ogden, who is an expert accountant, and a Republican. Mr. Kuhn will arrive in Salt Lake this morning to begin work under the terms of the investigation. Mr. Brown has been at work on the books of the state land board for more than a month.

" 'No sooner had the Senate been called to order yesterday, and there was feverish haste in getting the Senate down to business. Senator Armstrong moved that Senate Bill No. 80, appropriating $25,000 for the purposes of the investigation, be passed by the Senate under suspension of the rules. The bill had been amended over night so that it gave the Governor the power to suspend any state officer who might be under investigation. The bill was rushed through the Senate and House without debate under a suspension of rules. It was engrossed in less than fifteen minutes and the Governor signed the bill within ten minutes after it had been presented to him.

" 'Officials Surprised.

" 'The suspension on the state officials last night came as a shock to those connected with the state land board, and with other offices throughout the state house. The Governor said that he had been compelled to suspend the two state officers

as it had been brought to his attention they had been interfering with special auditors who had been placed in their departments, and further that they had not been rendering the assistance necessary in order that the true state of affairs in the two departments might be reported to the Governor. Those who are in touch with the affairs of the Governor's office declared last night that it was the intention to go through every department of the state government.

" 'While efforts have been made by the administration to probe into the affairs of the state land board, it was necessary to get the bill through in order that the investigators might be clothed with the authority of the state to enter banking houses and other corporations, where it is alleged that the investigators might secure evidence of irregularities in connection with the conduct of the affairs of the state land board and other state institutions and departments.

" 'May Suspend Other Members.

" 'With the secretary of the state land board suspended reports were in circulation last night that the Governor might take such steps today as would cause other members of the state land board to be suspended until the investigation is completed. These reports were not confirmed by the Governor's office, but it was asserted that the Governor might make a move either today or during the early part of next week which would lead to startling situations in the state house.

" 'Republican appointees who are not in the spotlight of the probe last night were wondering whether or not the investigation would extend to their offices. It was asserted by Governor Bamberger that he intends to find out the exact condition of affairs and that to that end he will investigate every office in the building if it is found necessary.

" 'Why the Suspension.

" 'I have suspended Mr. Lynch as secretary of the state land board because his department is being investigated and for the reason that it has been brought to my attention that he has not given that assistance which is necessary, but, on the other hand, retarded the investigation, said Governor Bamberger. The fish and game department was also being in-

vestigated and I was informed by those who are in charge of the investigation there that they have not been given the assistance, but, on the contrary, have been retarded in their efforts to get at the truth. In order that the investigators might have a free hand and might get facts I suspended both the officials until the investigations are completed.

" 'It may as well be understood plainly at this time that any state appointees or state employees who interfere in any way with the investigators and who do not give to the investigators every assistance when called upon to do so will be suspended. In addition, any state appointee who becomes officious during this investigation or who tries to conceal the real state of office affairs or who does not try to aid in getting to the bottom of things will be suspended. The administration does not intend to be hampered through having state appointees and state employees interfering with those who are representing the Governor in this investigation. We intend to make this investigation thorough and we are going to the very bottom of things, in order that we may know just what must be done in order that the affairs of the state may be placed in proper condition if it is found that the affairs of the state need to be placed in proper condition.

" 'With the appropriation made by the Legislature, it is intended that the machinery of the investigation shall get to work and get to the facts in the matter. From now until the investigation is completed F. D. Brown will be the chief investigator of the books and the audit and he will be empowered to handle the affairs as he sees fit. No attorneys have yet been considered in connection with the investigation.

" 'Lynch, presumably, will hold the fort until he is ousted by the Legislature, or by other legal procedure. Sensational developments may be expected at any time.

" 'The Governor's special investigators are hard at work. The belief is growing that Governor Bamberger's special agents have been secretly at work ever since his election, and that startling disclosures are imminent.'

"That in said issue of said newspaper issued, published and circulated, as aforesaid, by the said defendants on the 16th

day of February, 1917, the said defendants did compose, print and publish and cause and procure to be published therein in an editorial column therein as an editorial concerning and regarding this plaintiff the further and following publication:

" 'When the Scandal Breaks.

" 'With the beginning of the state investigation at the capitol, it becomes evident startling disclosures are to be made. Men are to go down in shame who should have remained respected citizens by obeying the moral code and the law of the state.

" 'Nothing is more shocking to the people than to find trusted public servants have betrayed them. A man in private life may gain a reputation for being unworthy of confidence and not be entirely disgraced, but a public official who proves unfaithful is lost. He scarcely has a place of usefulness in any community.

" 'Because of the ineffaceable stigma which will attach to the men who are published as offenders against the state, the most scrupulous care should be exercised in seeing that no mistakes are made.

" 'The task before the investigators is a very big one. Out of the labors may come heartaches and blighted lives, and the very seriousness of the undertaking adds to the responsibility of those who are delving down into the records of acts good and bad of Utah's honored men.

" 'An Ogden business man has said the penalty for state embezzlers should be shooting.

" 'No, death is merciful. The average man who errs so egregiously, if not entirely lost to conscience, would not object to being taken out and shot, as he awakens to the enormity of his offending and realizes the odium that is upon him and his family.

" '*The Standard* feels a deep sympathy for the innocent who must suffer. The wives and children of men who have gone astray are the ones to receive our profound sorrow, and had we the power, they would be shielded from the world's harsh criticism.' "

The contention made by appellant's counsel with respect to

the foregoing quoted articles may be best stated in the language of their brief as follows:

"Is there any possible construction of the English language that will justify a conclusion that the charges of the editorial do not refer to and were not intended to be connected with these news statements? Can it be said that even a casual reader of this paper would not say at once that state officials had been guilty of a betrayal of trust and were to be punished, and that they were now under investigation?

"While we submit that no other conclusion can be reached, upon reading the statements of the editorial in connection with the news statements above referred to, that it was charged will all possible positiveness that state officials had been guilty of wrong, had betrayed their trusts, were embezzlers, and that the plaintiff in this case was one of those charged; yet we further submit that in order to maintain this action for libel it is not necessary that the charge should be direct and positive, but that the imputation may be inferred, and, if it can reasonably be said that such imputation may be inferred, then the action will lie."

We agree with counsel that the items in question, for the purpose of testing the sufficiency of appellant's complaint, may be treated and regarded as one connected statement, although they appeared as separate articles and in different columns of the respondents' newspaper. It is **1, 2, 3** a matter of common knowledge that in newspaper publications news items of importance and of general interest to the public are frequently taken up, discussed, and commented upon editorially in the same issue of the paper, and when thus treated we think they are to be regarded as being connected, and their effect determined as a whole. We cannot, however, with like approval, meet the contention made by counsel that the matters complained of by appellant are defamatory in their nature; nor do we think that they are to be held directly, or by any proper innuendo, to apply to any particular officer or class of officers of the state of Utah. The news item complained of was nothing more, in substance and effect, than the announcement of a legislative appropriation of public money

for the purpose of conducting an investigation of the affairs of state offices; that the Governor, pending an investigation, had suspended certain officials, including Mr. Lynch, the appellant, as secretary of the state land board, because of their alleged failure to give the necessary assistance to those who were conducting the investigation. We fail to perceive, after careful reading and consideration of all this article contains, that any accusation is made of any official wrongdoing on the part of the appellant, unless it be that of his alleged failure to give the proper assistance to the investigators, the truth of which is not denied by the complaint in this action. Read in connection with the editorial complained of, and treating the two publications as a whole, with every word duly considered and amplified to the fullest degree, we again fail to perceive any undue reflection on the official character of the appellant or other than mere editorial comment on the seriousness and gravity of the undertaking on the part of the investigators "who are delving down into the records of acts good and bad of Utah's honored men," and therefore, "because of the ineffaceable stigma which will attach to all men *who are published as offenders* against the state, the most scrupulous care should be exercised in seeing that no mistakes are made." (Italics ours.) The editorial was not assertive in any degree, as we view it, that the appellant had committed the wrongs or betrayed the public trust as set forth in the innuendo of his complaint; nor can it be fairly interpreted as referring to any class of officers except such as may be found offenders upon investigation of the acts and affairs of all state officers during the extended period of time the act of the Legislature was designed to cover.

Assuming that the articles complained of were defamatory in their nature, before they are to be regarded actionable they must refer to some ascertained or ascertainable person, and that person must be the person complaining, shown to be such by directly being named, or so intended from the extrinsic facts and circumstances. 25 Cyc. 362. True, the articles in question expressly name the appellant and state his office is being investigated, but in this day and age of

public affairs, when investigations are being so universally held, as a matter of right and public policy we take it that no state official has a right to complain of the announcement through the public press that his, with other state officials, conduct is being or to be investigated in compliance with legislative enactment.

The language employed in these articles cannot be held to have any technical meaning. The words used are the plain, ordinary words of the English language having no particular signification whatever. Therefore no innuendo was essential to determine their meaning. Again, it was for the court to say whether the language used or words employed in the articles are susceptible of the meaning attached to them by the allegations of the innuendo of the appellant's complaint. Odgers, Libel & Slander, p. 129; 17 R. C. L. p. 398, section 152; *Diener* v. *Star-Chronicle Pub. Co.*, 230 Mo. 613, 132 S. W. 1143, 33 L. R. A. (N. S.) 216.

But, assuming the articles complained of by appellant were libelous as to some person or persons, although the appellant is not expressly mentioned, counsel further contends that under the rule laid down by this court in the case of *Fenstermaker* v. *Tribune Pub. Co.*, 12 Utah, 439, 43 Pac. 112, 35 L. R. A. 611, and other authorities cited in appellant's brief, the complaint states a cause of action and the respondent's demurrer should not have been overruled. We have examined with great care all the authorities cited by appellant, and after doing so are convinced that the doctrine announced by them does not apply to the case at bar. In those cases it was held that where words defamatory in their character seem to apply to a particular class of individuals, and are not specifically defamatory of any particular member of the class, an action can be maintained by any individual of the class who may be able to show the words referred to himself. In the case at bar the articles complained of refer, as we have heretofore pointed out, to only such of the great number of state officers as may be found upon investigation to have been derelict in their official duties, and they certainly cannot be held, by any reasonable or proper innuendo, to

apply to the appellant nor to any other state officer who is found faithful to his trust. As stated in 25 Cyc. 363:

"Where the defamatory matter has no special application and is so general that no individual damages can be presumed, and the class referred to is so numerous that great vexation and oppression might grow out of a multiplicity of suits, no private suit can be maintained."

We cannot hold that the articles complained of reflect upon the appellant in the slightest degree as a public officer, neither as a member of a class nor as being one of the great number of state officers, to all of whom they imply impartially. If they are to be regarded defamatory in their nature at all, then, indeed the public press has a very limited field in which to discuss and comment on matters appertaining to the affairs of the state which are of vital interest to all of its citizens alike. As to the transgressor they speak the truth, and in that there can be no legal defamation.

For the reasons stated, the judgment of the district court is affirmed. Costs to respondents.

FRICK, C. J., and McCARTY, THURMAN, and GIDEON, JJ., concur.