W. D. JACOBS, Respondent, v. TRANSCONTINENTAL & WESTERN AIR, INC., a Corporation, and WILLIAM MAXFIELD, Appellants.—No. 40749.—216 S. W. (2d) 523.

Division One, December 13, 1948.

Rehearing Denied, January 7, 1949.

Harry L. West, Harold L. Warner, Jr., Garrett & Ruark and Walter A. Raymond for appellants.

Harry C. Clark and Louis W. Krings for respondent.

[523] DOUGLAS, P. J.—Plaintiff recovered judgment for $500 actual and $2,500 punitive damages in an action for libel. Defendants appealed to the Kansas City Court of Appeals. That court affirmed the judgment, and transferred the case here because its decision conflicted with a ruling of the Springfield Court of Appeals. 205 S. W. (2d) 887.

We consider a case transferred from a court of appeals the same as an original appeal. Art. V, Sec. 10, Constitution 1945. We find the judgment should be reversed for the reason the words complained of are not libelous.

Plaintiff entered the employment of the defendant T. W. A. as a polisher of airplanes. He described his duties in this manner: "I

took a cleaning compound [524] and polished the dust and dirt off of them so they shine, and I kept that up all day." He was paid 40 cents an hour for a 48 hour week. Then he was promoted to be an airship's cleaner at 42 cents an hour. He did this work for almost a year until he was promoted to be an apprentice mechanic at 44 cents an hour. As an apprentice mechanic he cleaned airplane parts that came off old airplanes. He would take the parts to the steam room where he would steam them. Then with a cleaning compound he would remove all the smudge so the parts could be repaired and used again. This work took him all over the plant.

Plaintiff, while working as a cleaner, tried to join the Airline Mechanics Association, the union which represented most of the employees, but was refused admission by the association because he was not eligible. Those who worked as polishers, cleaners, and as less than Class "C" mechanics were not admitted to membership in the association. After the members of the association had received a wage increase, the polishers and cleaners became dissatisfied. This group, including plaintiff, took steps to find a union to represent them. Plaintiff and others solicited memberships for a CIO union which was to be chartered at defendant's plant. They passed out membership applications and literature and solicited members. On August 19th, plaintiff joined the CIO union, and on August 20th, he was discharged from his job. The following day he received his final pay check and a letter of dismissal officially terminating his services. The letter was signed by defendant Maxfield, a T. W. A. official.

Within two or three days after his discharge from T. W. A., plaintiff was employed at the Cudahy packing house in the cleaning department. He received 70¢ an hour which was increased to 75¢, then to 78½¢. He worked there until May, 1944, when he quit. Then he worked for the Kansas City Structural Steel Company for 86¢ an hour. From there he went to work for the Commonwealth Aircraft Corporation for 85¢ an hour. Then he went back to farming in Oklahoma.

Copies of the letter of dismissal about which plaintiff complains were sent as interoffice correspondence to two employees of T. W. A., and a copy was also sent to the association. The letter was as follows:

"Interoffice Correspondence"

"Transcontinental & Western Air, Inc.

"To: Mr. W. D. Jacobs

Sent From: Kansas City

"C" Apprentice
"At: Clock No. 312,
Kansas City,

Date: August 21, 1941

"Your File No.:

Our File No:

"Subject: Termination of Services

"It has been necessary to terminate your services effective 4:00 P. M., August 20, 1941.

"This action was taken after considering and investigating reports of Maintenance Department Supervisory Personnel to the effect that you have, during your working hours, been neglecting your assigned duties and causing a loss of efficiency on the part of other employees by unnecessary loitering in the hallway and in the hangar.

"We regret that it has been necessary to take this action but it is necessary that all T. W. A. employees attend to their assigned duties in a spirit of willingness and cooperation.

"Before receiving your final pay check, it will be necessary to turn in all T. W. A. equipment in your possession and receive a Maintenance Department Clearance Sheet from Mr. Putnam.

(Signed) Wm. Maxfield

System Superintendent

of Maintenance."

WM:w

cc: G. A. Putnam

L. M. Reed

A.M.A."

Plaintiff states in his petition that the statements in the letter charging him with neglecting his duties, causing loss of efficiency by the other employees, and failing to cooperate were false. He asserts as his round for recovery: "That said [525] words in said letter were libelous and in defamation of plaintiff's skill, capacity and fitness to perform and discharge his duties as polisher and that said language directly tended to prejudice plaintiff in his trade, business and employment by imputing to him a want of knowledge, skill, capacity and fitness to perform and discharge the duties of his job and were therefore actionable *per se.*" Plaintiff further alleges in his petition that as a result of the publication of the letter plaintiff's reputation has been injured and prejudiced in the pursuit of his trade, business and employment and that he will be unable to secure gainful employment as a mechanic in his community.

The initial question for decision is whether the words of the letter are libelous on their face so that the mere use of the words without more is sufficient to sustain an action for damages, that is, whether the words are actionable *per se.* If the words are not actionable *per se,* defendants' motions for directed verdict should have been sustained because plaintiff has pleaded no extrinsic facts in order to show a libelous meaning of the words used so as to make them actionable. The question whether the letter was libelous was not discussed by the Court of Appeals but has been preserved for appellate review.

Plaintiff bases his action upon injury to him in his trade, business and employment caused by the libelous words. He does not charge that he was exposed "to public hatred, contempt or ridicule" or was deprived "of the benefits of public confidence and social intercourse," the statutory definition of libel which is punishable as an offense. Sec. 4758, R. S. 1939, RSA.

False words tending to injure a person in his profession, trade or employment are ordinarily actionable, and sustain a recovery of money damages. We have expressed the rule in these words: "The publication of false statements or language, whether written or oral, which directly tend to prejudice or injure a person in his profession, trade, business, or employment, by imputing to him a want of knowledge, skill, capacity or fitness to preform or discharge the duties thereof, is actionable per se." Heitzeberg v. Von Hoffmann Press, 340 Mo. 265, 100 S. W. (2d) 307, 309. In a much earlier case we pointed out that words to be actionable *per se* must be such; if true, as would disqualify a person or render him less fit properly to fulfill the duties incident to the special character he has assumed. Words to be actionable as disparaging a person in his calling must touch him in his office, profession or trade. They must impeach either his skill or knowledge, or his official or professional conduct. We said that every false charge is not libelous but must come within the definition. Legg v. Dunleavy, 80 Mo. 558. It is stated in the Restatement of Torts § 573 that for defamation of a person in his trade the disparaging words to be actionable *per se* must affect the plaintiff in some way which is peculiarly harmful to one engaged in his trade. "Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession."

A writing claimed to be libelous must be interpreted from its four corners. Hylsky v. Globe Democrat, 348 Mo. 83, 152 S. W. (2d) 119; Kleinschmidt v. Bell, 353 Mo. 516, 183 S. W. (2d) 87. It must be given its ordinary meaning in the plain and popular sense. Words claimed to be libelous "will be construed fairly by their natural import, according to the ideas they were calculated and intended to convey to those to whom they were addressed, and pinned down to some one commonly accepted meaning, one generally understood." Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S. W. 1143.

Coming now to the facts of this case, we may first observe that this is a situation where plaintiff has not lost his position because of the libelous statements of some third person. He lost his position because [526] his employer discharged him for reasons of its own. The statement he claims was libelous accompanied his dismissal, was not the cause of it. So we have for determination the question whether the statement will thereafter tend to injure plaintiff in his trade.

In the letter of dismissal defendants did not impute to plaintiff a want of knowledge, skill, capacity or fitness to perform the duties of an airplane polisher or mechanic which he claims as his trade. The letter did not touch on plaintiff's qualifications or ability to perform his work. In fact it made no reference of any kind to the character or quality of the work performed by him. The charge was that plaintiff had been neglecting his duties which meant in this case that he was not devoting his full time to them. This does not disparage plaintiff's ability and skill to perform his work when he devoted his time to it, particularly since the letter goes on to explain the very way he was neglecting his duties. It charges him with loitering in the hallway and in the hangar. Taking the whole statement together, as we must, there is nothing defamatory in charging plaintiff with neglecting his duties because he loitered unnecessarily in the hallway and the hangar, and by doing so decreased the efficiency of other employees. There is no imputation of disgrace arising from the word loiter. It is commonly understood to mean to linger, to delay, to be slow moving. Then the letter goes on to say that all T. W. A. employees should "attend to their assigned duties in a spirit of willingness and cooperation." So the charge may be restated in this way, that plaintiff did not cooperate because he neglected his duties and interfered with other employees in performing theirs by loitering in the hallway and in the hangar. Certainly there is nothing in this charge that in any way imputes dishonesty, disloyalty, unreliability, or unworthiness of trust to plaintiff. It in no wise touches his character or his reputation. It imputes no quality which impairs his performance of the duties of his trade. It imputes no incompetence or unfitness, no lack of skill or ability. It does not prejudice him in his trade. It does not touch his skill or ability in his work either as an airplane polisher or mechanic. It imputes no quality or attribute of character which would injure him in his relations with an employer. It does not defame him. Therefore, it is not libelous.

Plaintiff relies on the decision of Chambers v. National Battery Co., 34 F. Supp. 834. An opinion by Judge Albert L. Reeves found that a charge of "indifference, lack of cooperation, carelessness, and lack of ability" was libel per se. However, that language differs from the charge in the present case because it touches the plaintiff's ability. But Judge Reeves also held that a statement that plaintiff "wont play ball with me" was not harmful or prejudicial. We understand that statement to charge the plaintiff in that case with refusing to cooperate.

A clearance card furnished a railroad employee on his discharge which stated: "Cause of leaving service, unsatisfactory service; conduct, good" was not libelous per se. Ill. Cent. R. Co. v. Ely, 83 Miss. 519, 35 So. 873.

680.

The language complained of in this case is of common understanding. It is unambiguous. It is not capable of double meaning. Since it is not libelous the trial court should have directed a verdict for defendants. Under the circumstances the court was clearly authorized to find as a matter of law the letter was not libelous. The rule is well settled in this state where the meaning of the words claimed to be libelous is unambiguous whether or not they will reasonably admit of a libelous construction is in the first instance a question of law for the court. Ukman v. Daily Record Co., 189 Mo. 378, 88 S. W. 60; Lee v. W. E. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S. W. (2d) 45; Patterson v. Evans, 254 Mo. 293, 162 S. W. 179; Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S. W. 1143; Cook v. Pulitzer Pub. Co., 241 Mo. 326, 145 S. W. 480. And it is the rule generally that the court determines whether a communication is [527] capable of a defamatory meaning. Restatement, Torts, § 614.

There was a provision in the Constitution of 1875, Art. II, Sec. 14, and repeated in Constitution 1945, Art. I, Sec. 8, which states that in suits and prosecutions for libel the jury, under the direction of the court, shall determine the law and the facts. But this provision does not in any way affect the power of the court to decide as a matter of law that the statement claimed to be libelous is not capable of a defamatory meaning. The constitutional provision stems from Fox's Libel Act adopted by the English Parliament in 1792. The act was adopted to correct a practice which had grown up in England in the trial of criminal libel prosecutions. Before the adoption of the act, it had become the usual practice that the judge, not the jury, should find and adjudge that the matter complained of was a libel. The judge would submit to the jury only the questions of proof of the publication, proof of the innuendoes, and proof of the other necessary averments But this practice was stopped by Fox's Act which required the whole case be left to the jury, just as any other criminal case. Thereafter under the act the jury would find a general verdict on the whole case, not a special verdict on the question of publication and the truth of the innuendoes. See State v. Armstrong, 106 Mo. 395, 16 S. W. 604, and Oakes v. State, 98 Miss. 80, 54 So. 79, 33 LRA (NS) 207. But the act did not deprive a judge of the authority to direct the jury to acquit because the case had failed in law. Capital and Counties Bank v. Henty, 7 Appeal Cases (1882) 1. c. 775.

The conclusion follows that the action of the trial court in submitting the case to the jury instead of directing a verdict for defendants was erroneous. The opinion of the Kansas City Court of Appeals affirming the judgment for plaintiffs should be quashed. The judgment of the trial court in favor of plaintiff should be reversed. It is so ordered.

The judgment is *reversed*. All concur.