2007 UT 41

**Nevin PRATT and Denise Pratt, Plaintiffs and Petitioners,**

v.

**Mary Ann NELSON (Roe); Douglas F. White; John Dustin Morris; William A. Mark; McKay, Burton, & Thurman, P.C.; and Does 1–200, Defendants and Respondents.**

No. 20051167.

Supreme Court of Utah.

May 18, 2007.

Carl E. Kingston, F. Mark Hansen, Salt Lake City, for plaintiffs.

John Dustin Morris, Salt Lake City, Douglas F. White, Bountiful, William A. Mark, North Salt Lake, for defendants.

DURRANT, Justice:

## INTRODUCTION

¶ 1 The plaintiffs, Nevin and Denise Pratt (the "Pratts"), filed a defamation claim against the defendants, Mary Ann Nelson and her attorneys (the "Nelsons"). The Pratts' claim arose from statements the Nelsons made and distributed to the media during the course of a press conference.

¶ 2 We granted certiorari in this case and are presented with three issues: (1) whether the invited error doctrine precluded the Pratts on appeal from raising their argument concerning the judicial proceeding privilege; (2) whether the Nelsons' statements were absolutely privileged under the judicial proceeding privilege and, if so, whether they lost that privilege through excessive publication;

1. She is currently known as Mary Ann Nichols.

and (3) whether the group defamation rule precluded the Pratts' defamation claim.

¶ 3 First, we hold that appellate review of the Pratts' argument regarding judicial privilege was not precluded by the invited error doctrine. Second, we hold that the Nelsons' statements, even if privileged, lost any immunity they may have had under the judicial proceeding privilege through excessive publication. Third, we hold that the group defamation rule does not preclude the Pratts' defamation claim. Therefore, we remand to the district court for further consideration of the Pratts' defamation claim.

## BACKGROUND

¶ 4 On October 15, 1997, when Mary Ann Nelson[1] was sixteen years old, her father, Daniel Kingston, allegedly forced her to marry her uncle, David Kingston. On August 1, 2003, Mary Ann and her counsel filed a complaint (the "Kingston Complaint") in Utah's Third District Court against her father, her uncle, and various other defendants, including Nevin and Denise Pratt, as well as the attorneys representing the Pratts in this case, F. Mark Hansen and Carl E. Kingston. In its opening caption, the Kingston Complaint named the Pratts, among nearly 400 other defendants—including individuals, businesses, churches, and associations—all of which allegedly had ties with the polygamous Kingston family and organization. Further, the body of the Kingston Complaint named the Pratts in a list with 240 other defendants known as "Order Individuals," and referred to these Order Individuals, along with 97 "Order Businesses," as "Order Members." The Kingston Complaint contained allegations of intentional and negligent sexual abuse of a child, assault, battery, false imprisonment, intentional and negligent infliction of emotional distress, negligence, and civil conspiracy. The Kingston Complaint alleged that Order Members, a group which specifically included the Pratts, were negligent and had assisted, encouraged, conspired, or knew of and failed to prevent or report the abuses alleged to have been committed by Mary Ann's father and uncle.

¶ 5 On August 28, 2003, Mary Ann and her counsel held a press conference concerning the lawsuit to which they invited members of both the Utah local press and the Associated Press. Ultimately, the press conference made local, national, and international news, reaching various media throughout the world via newspaper, television, and the internet. At that press conference, Mary Ann and at least two of her attorneys made several statements regarding the defendants listed in the Kingston Complaint. These statements did not specifically mention the Pratts by name, but instead made general reference to the "society," the "organization," and "the Order." Additionally, Mary Ann's attorneys provided copies of the previously filed Kingston Complaint to members of the press. They also gave copies of Mary Ann's prepared written statement (the "Prepared Statement") to two or three reporters.[2] One of Mary Ann's attorneys told reporters that the individuals identified by name in the complaint were "the key members of the Kingston organization" and that the Nelsons were trying to punish and "make an example of them."

¶ 6 On February 11, 2004, the Pratts filed a complaint alleging, among other claims, that the Nelsons had defamed the Pratts at the press conference and through the publicity that resulted from it. In response, the Nelsons filed a motion to dismiss for failure to state a claim. The Pratts filed a memorandum in opposition to the motion to dismiss, and the Nelsons responded with a reply memorandum in support of their motion to dismiss. In their reply memorandum, the Nelsons argued for the first time that the judicial proceeding privilege precluded any of the Pratts' defamation claims that were founded on the Kingston Complaint. In addition, the Nelsons included with their reply memorandum the affidavit of William Mark, one of Mary Ann's attorneys who were present at the press conference. Mark's affidavit averred that the Nelsons had only generally referred to the defendants named in the Kingston Complaint, never mentioning the Pratts by name. The district court entered an order converting the Nelsons' motion to dismiss into one for summary judgment and allowing the parties to file supplemental pleadings.

¶ 7 On May 7, 2004, the district court issued an order stating that the Nelsons' reply memorandum had raised the judicial proceeding privilege for the first time. In the interest of fairness, the district court granted the Pratts eight days to respond solely to that issue. But the Pratts did not file their responsive memorandum until over a month after the district court's deadline for filing had passed. The Pratts offered no explanation for their late filing, nor did they seek an extension of the deadline. The Nelsons moved to strike the Pratts' late response. The Pratts filed a memorandum opposing the Nelsons' motion to strike and moved to strike the Nelsons' judicial privilege argument as improperly raised for the first time in a reply memorandum.

¶ 8 On August 17, 2004, the district court entered its ruling on all pending motions. The district court granted the Nelsons' motion to strike the Pratts' late memorandum, ruling that the memorandum would not be considered because it was unauthorized under rule 7 of the Utah Rules of Civil Procedure. The district court also denied the Pratts' motion to strike the Nelsons' judicial privilege argument, reasoning that the Pratts had been given the opportunity to address the argument but had chosen not to respond within the allotted time and were "solely to blame for their own late filing" and could not "complain of unfairness." The district court then considered the Nelsons' motion for summary judgment.

**2.** Mary Ann's Prepared Statement read as follows:

My name is Mary Ann and I was raised in the Kingston Polygamist Family. I escaped when I was 16 years old. I am pursuing this lawsuit with the hope that other young girls and boys in the same position that I was in will see that the leaders of the Kingston Organization are not above the law, even though they tell us that they are, that they can be punished for what they do to us, and that we can escape and seek recovery for the harm that was done to us. I also hope that the people that we are bringing this lawsuit against will realize the harm they have caused and continue to cause, and that they will change their ways.

¶ 9 The district court concluded that the Kingston Complaint was protected by the judicial proceeding privilege, which "acts as an absolute bar to the Pratts' claim of defamation arising from allegations made in [the Kingston C]omplaint." The district court also held that the Prepared Statement was not defamatory toward the Pratts, as a matter of law, because the statement never specifically mentioned the Pratts, but only referred to a larger group of persons, such as the "leaders of the Kingston organization," "the people that we are bringing this lawsuit against," and "the Kingston Family Organization." The district court concluded that "no reasonable jury could interpret the [Prepared S]tatement to refer to [the Pratts] specifically."

¶ 10 The Pratts appealed to the Utah Court of Appeals, which affirmed the district court's grant of summary judgment.[3] The court of appeals did not reach the merits of the Pratts' challenge to the district court's application of the judicial proceeding privilege because the Pratts "invited any error in the trial court's ruling."[4] The court of appeals held that the invited error doctrine precluded the Pratts from arguing this issue on appeal and, as a result, affirmed the district court's ruling "dismissing the Pratts' claims that [were] founded upon their names appearing in the Kingston Complaint."[5] Consequently, the Pratts could not "rely on any references to them in the Kingston Complaint to support their claims based on statements the [Nelsons] made at the press conference."[6] Thus, the court of appeals concluded that under the group defamation rule "the [Nelsons' other] statements cannot, therefore, be reasonably understood to refer to the Pratts without the aid of the Kingston Complaint."[7]

¶ 11 We granted certiorari as to the issues presented above and have jurisdiction pursuant to Utah Code section 78-2-2(5).

## STANDARD OF REVIEW

¶ 12 "On certiorari, we review the court of appeals' decision for correctness, focusing on whether that court correctly reviewed the trial court's decision under the appropriate standard of review."[8] "In the context of a summary judgment motion, which presents a question of law, we employ a correctness standard and view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party."[9]

## ANALYSIS

¶ 13 We are presented with three issues regarding the Pratts' defamation claim. We will first discuss our invited error doctrine and its application to this and other cases. Next, we will discuss the judicial proceeding privilege and the excessive publication rule, specifically with respect to statements made and distributed during a press conference. Finally, we will discuss the group defamation rule and its application to the statements at issue in this case.

## I. THE INVITED ERROR DOCTRINE

¶ 14 This case initially turns on whether the Pratts may make an argument on appeal regarding the judicial proceeding privilege. The court of appeals held that the "invited error" doctrine precluded the Pratts from doing so. We now use this occasion to discuss our invited error doctrine and to clarify its application to this and other cases. We hold that invited error did not preclude the Pratts from advancing their judicial privilege argument on appeal and therefore the issue is now properly before us.

### A. Preserving an Issue for Appeal

¶ 15 Generally, "in order to preserve an issue for appeal the issue must be

---

3. *Pratt v. Nelson*, 2005 UT App 541, ¶ 24, 127 P.3d 1256.

4. *Id.*

5. *Id.*

6. *Id.*

7. *Id.*

8. *Hansen v. Eyre*, 2005 UT 29, ¶ 8, 116 P.3d 290 (internal quotation marks omitted).

9. *Dowling v. Bullen*, 2004 UT 50, ¶ 7, 94 P.3d 915.

presented to the trial court in such a way that the trial court has an opportunity to rule on that issue."[10] We have set forth three factors that help determine whether the trial court had such an opportunity: "'(1) the issue must be raised in a timely fashion; (2) the issue must be specifically raised; and (3) a party must introduce supporting evidence or relevant legal authority.'"[11] In short, a party may not claim to have preserved an issue for appeal by "merely mentioning ... an issue without introducing supporting evidence or relevant legal authority."[12] Ultimately, the preservation requirement "is based on the premise that, 'in the interest of orderly procedure, the trial court ought to be given an opportunity to address a claimed error and, if appropriate, correct it.'"[13]

### B. A "Plain Error" Review May Be Available in Cases Where a Party Has Failed to Preserve an Issue for Appeal

¶ 16 In cases where a party raises an issue on appeal, but the party did not properly preserve the issue below, "we review it under the manifest injustice or plain error standard."[14] Under plain error review, we may reverse the lower court on an issue not properly preserved for appeal when a party can show the following: "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the [party], or phrased differently, our confidence in the verdict is undermined."[15] Nevertheless, under the invited error doctrine, "we have declined to engage in even plain error review when 'counsel, either by statement or act, affirmatively represented to the [trial] court that he or she had no objection to the [proceedings].'"[16]

### C. "Invited Error" Precludes Appellate Review of an Issue

¶ 17 "Our invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error."[17] By precluding appellate review, "the doctrine furthers this principle by 'discouraging parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal.'"[18] Further, parties are "not entitled to both the benefit of not objecting at trial and the benefit of objecting on appeal."[19] Thus, "[e]ncouraging counsel to actively participate in all proceedings and to raise any possible error at the time of its occurrence

**10.** *Brookside Mobile Home Park, Ltd. v. Peebles,* 2002 UT 48, ¶ 14, 48 P.3d 968 (citing *Badger v. Brooklyn Canal Co.,* 966 P.2d 844, 847 (Utah 1998)).

**11.** *Id.* (quoting *Badger,* 966 P.2d at 847).

**12.** *State v. Cruz,* 2005 UT 45, ¶ 33, 122 P.3d 543 (internal quotation marks omitted).

**13.** *Id.* (quoting *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346).

**14.** *State v. Powell,* 2007 UT 9, ¶ 11, 154 P.3d 788; *see State v. Winfield,* 2006 UT 4, ¶ 14, 128 P.3d 1171 ("When a party raises an issue on appeal without having properly preserved the issue below, we require that the party articulate an appropriate justification for appellate review, specifically, the party must argue either plain error or exceptional circumstance." (internal quotation marks and citations omitted)); *see also State v. Casey,* 2003 UT 55, ¶ 40, 82 P.3d 1106 (stating that "in most circumstances the term 'manifest injustice' is synonymous with the 'plain error' standard expressly provided in Utah Rule of Evidence 103(d)" (internal quotation marks omitted)).

**15.** *Casey,* 2003 UT 55, ¶ 41, 82 P.3d 1106 (internal quotation marks omitted).

**16.** *Winfield,* 2006 UT 4, ¶ 14, 128 P.3d 1171 (quoting *State v. Hamilton,* 2003 UT 22, ¶ 54, 70 P.3d 111 (alterations in original)); *accord State v. Pinder,* 2005 UT 15, ¶ 62, 114 P.3d 551; *State v. Geukgeuzian,* 2004 UT 16, ¶ 9, 86 P.3d 742.

**17.** *Winfield,* 2006 UT 4, ¶ 15, 128 P.3d 1171 (internal quotation marks and citation omitted).

**18.** *Id.* (quoting *Geukgeuzian,* 2004 UT 16, ¶ 12, 86 P.3d 742); *see State v. King,* 2006 UT 3, ¶ 13, 131 P.3d 202 ("This rule is designed to ... inhibit a defendant from foregoing ... an objection with the strategy of enhancing the defendant's chances of acquittal and then, if that strategy fails, ... claiming on appeal that the court should reverse." (internal quotation marks omitted)).

**19.** *King,* 2006 UT 3, ¶ 13, 131 P.3d 202 (internal quotation marks omitted).

fortifies our long-established policy that the trial court should have the first opportunity to address a claim of error."[20]

### 1. Invited Error Generally Requires an Affirmative Representation to the Court

¶ 18 We have recently stated, "Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations reassure the trial court and encourage it to proceed without further consideration of the issues."[21] The following cases illustrate affirmative representations that can properly be characterized as leading the court into error.

¶ 19 In *State v. Hamilton*,[22] the defendant argued on appeal that instructions given to the jury were prejudicial.[23] But before the trial court instructed the jury on the law, defense counsel had approved the disputed language.[24] The trial court specifically required "counsel to confirm on the record, that the State takes no exception to the instructions ... nor does the Defense."[25] Defense counsel did so by affirmatively indicating that they had no objections to the jury instructions.[26] Thus, we held that the mani-

fest injustice exception did not apply because invited error precluded review of the jury instructions.[27]

¶ 20 In *State v. King*,[28] defense counsel made an affirmative representation to the trial court, both during and after voir dire, that he had no objection to the jury panel that was selected.[29] We held that the defendant had failed to preserve the issue of whether the jury was impartial for appellate review and stated that the defendant must demonstrate plain error.[30] We recognized, however, that defense counsel's affirmative representations to the court that he had no objections to the jury panel implicated the invited error doctrine.[31] But we declined to apply invited error only because the State had failed to raise the issue in its brief.[32]

¶ 21 In *State v. Dunn*,[33] the defendant argued that "the trial court committed reversible error when it reversed its pretrial ruling and allowed questioning about his prior conviction."[34] He argued that "if he had known that the prior conviction was going to be admissible, he would not have taken the stand or, at the very least, he would have deflected the impact of the prior conviction

---

20. *Winfield*, 2006 UT 4, ¶ 15, 128 P.3d 1171 (internal quotation marks and citation omitted).

21. *Id.* ¶ 16; *see State v. Medina*, 738 P.2d 1021, 1023 (Utah 1987) ("[T]he fact remains that counsel consciously chose not to assert any objection that might have been raised and affirmatively led the trial court to believe that there was nothing wrong with the instruction.").

22. 2003 UT 22, 70 P.3d 111.

23. *Id.* ¶ 55.

24. *Id.*

25. *Id.* (internal quotation marks omitted).

26. *Id.*

27. *Id.* ¶ 54.

28. 2006 UT 3, 131 P.3d 202.

29. *Id.* ¶¶ 7–8.

30. *Id.* ¶ 20.

31. *Id.* ¶ 20 n. 2.

32. *Id.; see State v. Casey*, 2003 UT 55, ¶ 39 n. 10, 82 P.3d 1106 (noting that while the invited error doctrine "may preclude application of the plain error analysis," the court will refuse to consider invited error when "neither party raised this question below or in their briefs or at oral argument").

The Pratts argue that the Nelsons did not raise the invited error issue before the court of appeals and, therefore, according to the Pratts, the court of appeals improperly addressed the issue sua sponte. But the Nelsons argued "that because of the Pratts' failure to timely file their memorandum presenting their legal arguments to the trial court, [the Pratts] cannot now ask [the court of appeals] to consider their judicial privilege arguments for the first time on appeal." *Pratt v. Nelson*, 2005 UT App 541, ¶ 15, 127 P.3d 1256. While the Nelsons may not have specifically called this an invited error argument, the court of appeals could properly deem it as such. As a result, the issue of invited error is properly before us.

33. 850 P.2d 1201 (Utah 1993).

34. *Id.* at 1220.

by disclosing it during his case-in-chief." [35] We held that the defendant was precluded from raising this claim of error because of the invited error doctrine.[36]

¶ 22 In *Dunn*, defense counsel moved to exclude the evidence of the prior conviction, "providing the trial court with citations to the authority on which the court based its pre-trial ruling." [37] But "contrary to [the defendant's] position before the trial judge, the law at the time clearly allowed evidence of prior convictions to be admitted for impeachment purposes without any restriction." [38] We concluded that "[defense] counsel's actions in making the motion in limine without informing the trial judge of the controlling law had led the trial court into error." [39] We therefore held that the defendant was "precluded from asserting that the pretrial ruling misled him into taking the stand." [40]

2. Invited Error Has No Application to the Pratts' Untimely Memorandum

¶ 23 We have yet to apply the invited error doctrine in a situation, such as here, where a party files an untimely responsive memorandum concerning an issue in the case. We are disinclined to do so now. In this case, the Pratts did not make an affirmative representation that led the court into error. The Pratts' late response in addressing the issue of judicial privilege is not enough on its own to fall within the realm of invited error. As the above cases illustrate, invited error generally occurs in a more affirmative manner, such as where counsel stipulates to the court's instruction, states directly that there is no objection to a specific ruling of the court, or provides the court with erroneous authority upon which the court relies. In this case, the Pratts did not, by statement or act, affirmatively represent to the district court that they had no objection to application of the judicial proceeding privilege and,

thereby, cannot be said to have led the court into committing any alleged error.[41]

¶ 24 Ultimately, the district court was aware of the judicial privilege argument and resolved the issue in a deliberate manner. While ·it is true that the district court did not have the benefit of the Pratts' argument, the issue was preserved for appeal when the district court was given notice of the issue (in this case, by the Nelsons) and when the court in response to such notice made a specific ruling on the issue. Regardless of the Pratts' lack of participation in the court's decision-making process, the judicial privilege issue was presented in such a way that the court had an opportunity to rule on that issue; therefore, plain error review does not apply in this case. Accordingly, we now consider the judicial privilege issue on appeal as well as the Pratts' accompanying argument.

## II. THE JUDICIAL PROCEEDING PRIVILEGE AND EXCESSIVE PUBLICATION

¶ 25 We must now determine whether the judicial proceeding privilege applies to the statements the Nelsons made during the press conference, which include the Kingston Complaint, the Prepared Statement, and any other oral statements. And if the privilege generally applies, we must then determine whether the Nelsons lost the privilege through excessive publication of their various statements.

A. *The Judicial Proceeding Privilege Clearly Applies to the Kingston Complaint, but as to the Prepared Statement and Other Oral Statements Made by the Nelsons It Is Doubtful the Privilege Applies*

¶ 26 As to the law of defamation, we have stated that

---

35. *Id.*

36. *Id.* at 1221.

37. *Id.* at 1220–21.

38. *Id.* at 1221.

39. *Id.*

40. *Id.*

41. One certain consequence of filing the late memorandum is that the transcript attached to the memorandum of the press conference was not included in the record and therefore will not be considered by us in this appeal.

false and defamatory statements are not actionable if they are protected by a legal privilege. A number of legal privileges are recognized in circumstances where communication must be wholly open, frank, and unchilled by the possibility of a defamation action. This is so even though the reputation of a person may be harmed by such statements.[42]

¶ 27 The common law judicial proceeding privilege immunizes certain statements that are made during a judicial proceeding from defamation claims. The privilege is "intended to promote the integrity of the adjudicatory proceeding and its truth finding processes."[43] It does so by facilitating the "free and open expression by all participants . . . [that] will only occur if they are not inhibited by the risk of subsequent defamation suits."[44]

¶ 28 In order to establish absolute immunity under the judicial proceeding privilege, the "statements must be (1) 'made during or in the course of a judicial proceeding'; (2) 'have some reference to the subject matter of the proceeding'; and (3) be 'made by someone acting in the capacity of judge, juror, witness, litigant, or counsel.' "[45]

¶ 29 We have held that the first requirement, that a statement must be made "during or in the course of a judicial proceeding," is interpreted broadly.[46] Indeed, "[t]he privilege applies to every step in the proceeding until final disposition,"[47] including certain pretrial[48] and posttrial statements.[49] "[W]e have indicated that a statement may qualify as made during or in the course of a judicial proceeding [even] if the communication is preliminary to a proposed judicial proceeding."[50] Thus, "[t]he judicial proceeding privilege extends to statements made prior to the filing of a lawsuit because it is intended to encourage reasonable efforts to resolve disputes prior to the filing of a complaint."[51]

¶ 30 As to the second requirement, a statement must have "some relationship to the cause or subject matter involved," although it "need not be relevant or pertinent to the judicial proceeding from an evidentiary point of view for the privilege to apply."[52] Thus, if doubt as to relevancy exists, it "should be resolved in favor of the statement having reference to the subject matter of the proceeding."[53]

¶ 31 The third requirement is relatively straightforward. The statement must be made by someone acting, with respect to the case at hand, in the capacity of judge, juror, witness, litigant, or counsel.

¶ 32 The Kingston Complaint was, at the time it was filed, clearly protected by the judicial proceeding privilege. It inarguably qualified as a statement made in the course of a judicial proceeding that had reference to the subject matter of the proceeding and was made by a litigant or counsel. Thus all three

**42.** *DeBry v. Godbe*, 1999 UT 111, ¶ 10, 992 P.2d 979.

**43.** *Id.*

**44.** *Allen v. Ortez*, 802 P.2d 1307, 1311 (Utah 1990).

**45.** *DeBry*, 1999 UT 111, ¶ 11, 992 P.2d 979 (quoting *Price v. Armour*, 949 P.2d 1251, 1256 (Utah 1997)).

**46.** *Id.* ¶ 14.

**47.** *Id.* (internal quotation marks omitted).

**48.** *See Beezley v. Hansen*, 4 Utah 2d 64, 286 P.2d 1057, 1058 (1955) ("The publication of defamatory matter by an attorney is protected not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and other communications preliminary thereto. The institution of a judicial proceeding includes all pleadings and affidavits necessary to set the judicial machinery in motion." (quoting Restatement (Second) of Torts § 586 (1977))).

**49.** *See DeBry*, 1999 UT 111, ¶ 14, 992 P.2d 979 (stating that "[n]umerous types of rulings and events that occur post-trial can affect the final disposition of a case" and thus the privilege may cover such statements).

**50.** *Krouse v. Bower*, 2001 UT 28, ¶ 9, 20 P.3d 895 (citing *DeBry*, 1999 UT 111, ¶¶ 12–14, 992 P.2d 979).

**51.** *Id.* ¶ 10.

**52.** *DeBry*, 1999 UT 111, ¶ 16, 992 P.2d 979 (internal quotation marks and citation omitted).

**53.** *Id.*

requirements for application of the judicial proceeding privilege were met with respect to the Complaint. While the Prepared Statement and other oral statements did have reference to the subject matter of the proceeding and were made by a litigant or counsel, it is doubtful statements made at a press conference qualify as having been made in the course of a judicial proceeding, even given our broad interpretation of that requirement. Regardless, even were we to assume that the Prepared Statement and other oral statements were otherwise privileged under the judicial proceeding privilege, that privileged status was lost through excessive publication.

B. *Any Privilege that the Nelsons' Statements May Have Otherwise Enjoyed Was Lost Through Excessive Publication*

¶ 33 A party may lose the absolute immunity afforded by the judicial proceeding privilege through "excessive publication." We have stated, "Case law generally holds that communications that are otherwise privileged lose their privilege if the statement is excessively published, that is, published to more persons than the scope of the privilege requires to effectuate its purpose."[54] Indeed, a publication is excessive if the statement

> was published to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation, in other words, if the [statement] was published to those who did not have a legitimate role in resolving the dispute, or if it was published to persons who did not have an adequate legal interest in the outcome of the proposed litigation.[55]

Thus, the purpose of the excessive publication rule "is to prevent abuse of the privilege by publication of defamatory statements to persons who have no connection to the judicial proceeding."[56]

¶ 34 When deciding if a statement was excessively published, we look to the "overall circumstances" of the publication and determine if the purpose of the judicial proceeding privilege, which is to "promote candid and honest communication between the parties and their counsel in order to resolve disputes," is furthered by the statement's publication.[57]

¶ 35 We hold that the Nelsons' statements made during the press conference, including the Kingston Complaint, the Prepared Statement, and other oral statements, lost through excessive publication any privileged status they may have otherwise enjoyed. In explaining the basis for this holding, we will first discuss our caselaw and the application of the excessive publication rule as it relates to press conferences and statements made or distributed by parties to the media.

1. Utah Cases Discussing the Application of the Excessive Publication Rule

¶ 36 In the case before us, the Nelsons organized a press conference to discuss publicly their lawsuit filed against various alleged members and associations of the Kingston Order. During the press conference, the Nelsons made several statements to reporters concerning the nature and purposes of their lawsuit. Additionally, the Nelsons distributed the Kingston Complaint and the Prepared Statement to several reporters, and those statements were later disseminated through various media outlets, including newspaper, television, and the internet. Although no Utah case discusses the application of the excessive publication rule with respect to press conferences and the media, several cases illustrate that when looking at excessive publication we consider (1) whether the recipients of the publication have a sufficient connection to the judicial proceeding and (2) whether the purpose of the judicial proceeding privilege would be furthered by protecting the publication. If the recipients of the publication are not sufficiently connected to the judicial proceeding and the purpose of the privilege would not be furthered by protecting the publication, then the

---

54. *Id.* ¶ 21.

55. *Krouse,* 2001 UT 28, ¶ 15, 20 P.3d 895.

56. *Id.*

57. *Id.* ¶¶ 15, 18.

statements in question lose their absolute immunity and privileged status.

¶ 37 In *Krouse v. Bower*,[58] we held that a demand letter was not excessively published even though it was sent to people who at the time were not directly involved in a lawsuit.[59] In that case, counsel for two condominium owners sent a demand letter to counsel for the condominium owners' association.[60] The letter indicated that courtesy copies of the letter were to be delivered to the individual condominium owners within the association, and, indeed, these copies were later distributed to the other owners.[61] Although the plaintiffs, who were mentioned in the letter, later sued for defamation, the trial court held that the letter fell within the judicial proceeding privilege.[62]

¶ 38 On appeal, we affirmed the privileged status of the demand letter and reviewed the issue of whether it was excessively published.[63] In doing so, we expressed concern that delivery of the letter directly to the individual owners, rather than to just their counsel, was not "necessary to effectuate the purpose of pursuing settlement," which was the alleged purpose of the letter.[64] Nevertheless, we held that the individual owners had a "clear legal interest" in the letter's subject matter.[65] We noted the overall circumstances of the letter's publication and pointed out that the association members were clients of the attorney who was the addressed recipient of the letter.[66] Further, we noted that the owners' association was a potential, and later named, party to the threatened lawsuit.[67] In light of these facts, we held that the individual owners would have likely received a copy of the letter or known of its substance and existence.[68] Because the purpose of the judicial proceeding privilege is to encourage "open, forthright discussion" and to promote "honest communication between the parties and their counsel in order to resolve disputes," we concluded that publication of the letter to the individual owners was not excessive.[69]

¶ 39 In *DeBry v. Godbe*,[70] we held that a letter sent to six people discussing out-of-court occurrences was not excessively published.[71] The letter was sent by Ms. Godbe, Mr. DeBry's counsel during his divorce proceedings.[72] In that case, we first held that the judicial proceeding privilege applied to the letter.[73] Next, we determined which of the people who received the letter had a sufficient connection to the judicial proceedings.[74] We held that four of the people, including the trial judge, Mr. DeBry, Ms. Godbe's co-counsel, and Ms. DeBry's counsel, were all "directly involved in the judicial proceeding."[75] We noted that the letter was not published to a fifth person because she never received or read it.[76] Finally, we held that the sixth person, Ms. Godbe's own attorney, was sufficiently connected to the judicial proceeding because he had originally advised her to send the letter and therefore had a "legally justified reason for receiving the letter."[77] Accordingly, we held that Ms. Godbe's letter did not lose the judicial proceeding

58. 2001 UT 28, 20 P.3d 895.
59. *Id.* ¶¶ 16–19.
60. *Id.* ¶ 3.
61. *Id.*
62. *Id.* ¶¶ 4–5.
63. *Id.* ¶ 1.
64. *Id.* ¶ 16.
65. *Id.* ¶ 17.
66. *Id.*
67. *Id.*
68. *Id.*
69. *Id.* ¶ 18.
70. 1999 UT 111, 992 P.2d 979.
71. *Id.* ¶¶ 22–24.
72. *Id.* ¶ 1.
73. *Id.* ¶¶ 11–20.
74. *Id.* ¶¶ 22–24.
75. *Id.* ¶ 22.
76. *Id.* ¶ 23.
77. *Id.* ¶ 24 (internal quotation marks omitted).

privilege through excessive publication.[78]

¶ 40 Consistent with these cases, to determine whether the Nelsons' statements were excessively published, we must decide whether the reporters and media outlets to whom the Nelsons published their statements had a sufficient connection to the judicial proceedings. Then we must determine whether the purpose of the judicial proceeding privilege would be furthered by protecting such publication to the press.

## 2. The Press Generally Lack a Sufficient Connection to Judicial Proceedings

¶ 41 In *Buckley v. Fitzsimmons*,[79] the United States Supreme Court held that Fitzsimmons, a prosecutor who allegedly made defamatory statements in a pretrial press conference, was not entitled to absolute immunity.[80] The Court noted that while "the speech of a counsel is privileged by the occasion on which it is spoken," "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." [81]

¶ 42 Although the Court never discusses an excessive publication exception to the ju-

dicial proceeding privilege, it appears that, in *Buckley*, the Court was of the view that, at the very least, statements made by counsel to the press concerning a case are not per se covered by an absolute privilege. And while *Buckley* arose in a criminal context and concerned state officials, the Court stated that "prosecutors, *like all attorneys*, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them, [while] most statements made out of court received only good-faith immunity." [82] It appears that the Court was unwilling to provide the privilege to statements made to people or in places that have no functional or legal tie to the judicial proceedings.[83]

¶ 43 In *Green Acres Trust v. London*,[84] the Arizona Supreme Court determined that the press generally lack a "relationship to the proposed or pending judicial proceeding," and therefore the judicial proceeding privilege did not apply to statements made by counsel during a press conference.[85] In that case, the attorney defendants were preparing to file a class action lawsuit against Green Acres on behalf of various clients.[86] The

78. *Id.* ¶ 22.

79. 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

80. *Id.* at 277, 113 S.Ct. 2606.

81. *Id.*

82. *Id.* (emphasis added). Further, the Court added in a footnote that
> [absolute immunity] does not apply to or include any publication of defamatory matter before the commencement, or after the termination of the judicial proceeding (unless such publication is an act incidental to the proper initiation thereof, or giving legal effect thereto); nor does it apply to or include any publication of defamatory matter to any person other than those to whom, or in any place other than that in which, such publication is required or authorized by law to be made for the proper conduct of the judicial proceedings.

*Id.* at 277 n. 8, 113 S.Ct. 2606 (internal quotation marks and citation omitted) (alteration in original).
> But we have stated, somewhat to the contrary, that certain statements even preliminary to the initiation of a lawsuit may be protected by the judicial proceeding privilege. *Krouse v. Bower*, 2001 UT 28, ¶ 10, 20 P.3d 895. This is in accord

with the Restatement (Second) of Torts section 586 (1977), which states that the privilege includes statements made "preliminary to" or "in the institution of" a judicial proceeding. Comment e to that section states the following:
> [The privilege] stated in this Section applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.

83. *See Prosser & Keeton on Torts* § 114, 816–20 (5th ed.1984) (stating that "[a]bsolute immunity has been confined to very few situations where there is an obvious policy in favor of permitting complete freedom of expression" such as a judicial proceeding and that, although a judicial proceeding "has not been defined very exactly," it "is clear ... that statements given to the newspapers concerning the case are no part of a judicial proceeding, and are not absolutely privileged").

84. 141 Ariz. 609, 688 P.2d 617 (1984).

85. *Id.* at 622–23.

86. *Id.* at 619.

attorneys met to review the draft of their complaint, and one of the attorneys invited a reporter to their law offices to learn about the basis for the class action.[87] The attorneys gave the reporter a draft of the complaint, and at least one attorney discussed the case with her.[88] Based in part on information obtained from the draft of the complaint and the conversation held with the attorneys, the reporter wrote an article describing the grounds of the class action suit and unfavorably characterizing the manner in which Green Acres did business.[89]

¶ 44 Green Acres sued the attorneys for defamation regarding the statements made and distributed to the reporter.[90] The attorneys claimed that there was an absolute privilege for statements made to the press by attorneys concerning pending litigation.[91] But the Arizona Supreme Court held that the reporter "had no relation to the proposed class action" and "played no role in the actual litigation other than that of a concerned citizen." [92] The court concluded that because the reporter "lacked a sufficient connection to the proposed proceedings, public policy would be ill served if [the court] immunized the communications made to the reporter by the lawyer defendants." [93] Moreover, "[t]he press conference simply did not enhance the judicial function and no privileged occasion arose." [94]

¶ 45 In *Asay v. Hallmark Cards, Inc.*,[95] the Eighth Circuit Court of Appeals also declined to extend the judicial proceeding privilege to statements, including a previously filed complaint, made and distributed to the media.[96] The court stated, "In determining whether an occasion is absolutely privileged, the pivotal factor is frequently to whom the matter is published. Publication to the news media is not ordinarily sufficient-

ly related to a judicial proceeding to constitute a privileged occasion." [97]

■ ¶ 46 We are inclined to agree with the Arizona Supreme Court and the Eighth Circuit in this matter. We hold that the press generally lack a connection to judicial proceedings sufficient to warrant an extension of the judicial privilege to statements made by parties to the press. Thus, in this case, the Nelsons' statements, when made to the press, were not protected by the judicial proceeding privilege. Their statements were published to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation. The press had neither any relation to the pending litigation nor any clear legal interest in the outcome of the case. At most, the reporters at the press conference were acting only in the capacity of concerned citizens. Further, the reporters played no legitimate role in resolving the dispute between the parties. As a result, the press in this case clearly lacked a sufficient connection to the pending proceedings.

3. The Purpose of the Judicial Proceeding Privilege Is Not Furthered by Protecting Statements Made to the Press

¶ 47 Extending the judicial proceeding privilege to statements made or distributed during a press conference would ill-serve the public policy underlying the privilege. In *Asay*, the Eighth Circuit stated that

[a]llowing defamation suits for communications to the news media will not generally inhibit parties or their attorneys from fully investigating their claims or completely detailing them for the court or other parties. Also, the important factor of judicial control is absent. The salutary policy of allowing freedom of communication in judi-

---

87. *Id.* at 619–20.

88. *Id.* at 620.

89. *Id.*

90. *Id.*

91. *Id.* at 622.

92. *Id.* at 622–23.

93. *Id.* at 623.

94. *Id.*

95. 594 F.2d 692 (8th Cir.1979).

96. *Id.* at 699.

97. *Id.* at 697; *see Penobscot Indian Nation v. Key Bank,* 112 F.3d 538, 560–61 (1st Cir.1997) (holding that the judicial proceeding privilege did not apply to statements made at a press conference).

cial proceedings does not warrant or countenance the dissemination and distribution of defamatory accusations outside of the judicial proceeding. No public purpose is served by allowing a person to unqualifiedly make libelous or defamatory statements about another.... The scope of the privilege is restricted to communications such as those made between an attorney and client, or in the examination of witnesses by counsel, or in statements made by counsel to the court or jury. Thus, while a defamatory pleading is privileged, that pleading cannot be a predicate for dissemination of the defamatory matter to the public or third parties not connected with the judicial proceeding. Otherwise, to cause great harm and mischief a person need only file false and defamatory statements as judicial pleadings and then proceed to republish the defamation at will under the cloak of immunity.[98]

■ ¶ 48 We have also stated that the purpose of the judicial proceeding privilege is "intended to promote the integrity of the adjudicatory proceeding and its truth finding processes."[99] Moreover, the privilege is meant to encourage "open, forthright discussion" and to promote "honest communication between the parties and their counsel in order to resolve disputes."[100] Statements made and distributed to the press concerning pending or ongoing litigation do little, if anything, to promote the truth finding process in a judicial proceeding. Further, statements made to the press do not generally encourage open and honest discussion between the parties and their counsel in order to resolve disputes; indeed, such statements often do just the opposite. Certainly, parties to a proceeding, whether attorneys, litigants, or witnesses, are free to speak their minds without fear of reprisal in the form of a defamation suit so long as their statements concern the subject matter involved and are made during or in the course of the judicial proceeding. And we generally have interpreted

"during or in the course of a judicial proceeding" broadly to include certain statements made before, during, or even after the proceeding. But we are disinclined to extend this broad requirement to statements made directly to the press, especially in a case such as this where a party called a press conference and distributed various statements to the media for widespread dissemination.

## III. GROUP DEFAMATION

■ ¶ 49 We now turn to whether the group defamation rule precludes the Pratts from pursuing their defamation claim. Generally, the group defamation rule precludes defamation suits based solely on statements made referring to groups or classes of people. We hold in this case that the Pratts, who were specifically named in the Kingston Complaint, are not precluded from pursuing their defamation claim.

### A. The Kingston Complaint May Be Considered for Defamation Purposes

■ ¶ 50 Because the Kingston Complaint lost its privileged status through excessive publication, it may properly be considered for alleged defamation alongside the other statements made by the Nelsons. Thus, the Nelsons' combined statements made and distributed at the press conference may provide a sufficient basis for a defamation claim.

### B. The Nelsons' Statements Specifically Named the Pratts

■ ¶ 51 In order to establish a claim for defamation, a party "must show that [the] defendants published the statements concerning [the party], that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage."[101]

98. *Asay*, 594 F.2d at 698 (internal quotation marks and citations omitted).

99. *DeBry v. Godbe*, 1999 UT 111, ¶ 10, 992 P.2d 979.

100. *Krouse v. Bower*, 2001 UT 28, ¶ 18, 20 P.3d 895.

101. *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994).

We must determine whether the Nelsons "published statements concerning" the Pratts.

¶ 52 Before defamatory statements may be regarded as actionable, a party must show that the statements "refer to some ascertained or ascertainable person."[102] A party may show this "by directly being named, or so intended from the extrinsic facts and circumstances."[103] Where defamatory statements appear to apply "to a particular class of individuals, and are not specifically defamatory of any particular member of the class, an action can [still] be maintained by any individual of the class who may be able to show the words referred to himself."[104] Ultimately, a party must "satisfy the jury that the words referred especially to himself."[105]

¶ 53 On the other hand, a party may defend itself from allegations of defamation with the group defamation rule. If "the defamatory matter has no special application and is so general that no individual damages can be presumed, and the class referred to is so numerous that great vexation and oppression might grow out of a multiplicity of suits, no private suit can be maintained."[106] Furthermore, section 564(a) of the Restatement (Second) of Torts provides the following:

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reason-

ably give rise to the conclusion that there is particular reference to the member.

¶ 54 We agree with the court of appeals that "without the aid of the Kingston Complaint, the [Nelsons'] statements at the press conference cannot be reasonably understood to refer, with any particularity, to the Pratts."[107] Indeed, "[w]ithout the Kingston Complaint, the Pratts can only point to the [Nelsons'] group references and argue that such statements defame them as individuals."[108] "[N]one of [the Nelsons'] allegedly defamatory statements ever directly mentioned the Pratts by name and, aside from the Kingston Complaint, none of the extrinsic facts and circumstances demonstrated that the statements were intended to specifically refer to the Pratts."[109] The Nelsons' statements "merely referred generally to large groups of people [such as] 'the Kingston Polygamist Family,' 'leaders of the Kingston Organization,'"[110] and "the people we are bringing this lawsuit against."

¶ 55 We also acknowledge, as the court of appeals noted, that "under the right circumstances the references to a group such as 'the Kingston Polygamist Family' might reasonably be understood to refer to an individual surnamed Kingston."[111] "In fact, if the Pratts were widely known as members of 'the Kingston Polygamist Family,' the Pratts might very well be able to maintain an action on such statements, even without referring to the Kingston Complaint."[112] But in this case, as the court determined, the statements made outside of the Kingston Complaint, including the Prepared Statement, "do not lend

---

102. *Lynch v. Standard Publ'g Co.*, 51 Utah 322, 170 P. 770, 773 (1918).

103. *Id.*

104. *Id.* (explaining *Fenstermaker v. Tribune Publ'g Co.*, 12 Utah 439, 43 P. 112 (Terr.1895)).

105. *Fenstermaker*, 43 P. at 114.

106. *Lynch*, 170 P. at 774 (internal quotation marks and citation omitted).

107. *Pratt v. Nelson*, 2005 UT App 541, ¶ 21, 127 P.3d 1256.

108. *Id.* ¶ 22.

109. *Id.* ¶ 19 n. 8.

110. *Id.*

111. *Id.* ¶ 22.

112. *Id.* In *Fawcett Publications, Inc. v. Morris*, 377 P.2d 42 (Okla.1962), the Oklahoma Supreme Court held that a single member of a football team consisting of "sixty or seventy members" could maintain a defamation claim even though he was not specifically mentioned. *Id.* at 47, 52. The court noted that the plaintiff was "well known and identified in connection with the group." *Id.* at 51. Moreover, the plaintiff had "sufficiently established his identity as one of those libeled by the publication." *Id.* at 52.

themselves to any reasonable understanding that they have personal application to the Pratts."[113]

¶ 56 Yet the Kingston Complaint, which we may now consider for defamation purposes, specifically named the Pratts on two occasions. In its opening caption, the Kingston Complaint named the Pratts among nearly 400 other defendants. Further, the Kingston Complaint named the Pratts in a list with 240 other defendants known as "Order Individuals," and referred to these "Order Individuals" as "Order Members." The Kingston Complaint then accuses these "Order Members" of negligence and assisting, encouraging, conspiring, or knowing of and failing to prevent or report the abuses alleged to have been committed by Mary Ann's father and uncle. There is no question that the Kingston Complaint specifically refers to ascertainable persons, including the Pratts. Additionally, it is now arguable that the Nelsons' other statements, in light of the Kingston Complaint and given the extrinsic circumstances, may have also made reference to the Pratts.

### C. The Size of the Group Referred to Is Irrelevant if Individuals Within that Group Are Specifically Identified by Name

¶ 57 The Nelsons argue that, under the group defamation rule, the large size of the groups referenced in their statements, including in the Kingston Complaint, precludes a defamation claim.[114] We disagree. In the Kingston Complaint the Pratts were specifically named. As a result, even the Nelsons' other statements might be viewed as referring to the Pratts as well. When statements explicitly refer to individuals by name, regardless of whether the individuals are part of a general group or larger listing of names, a party cannot rely on the group defamation rule as a defense. For example, if a party generally refers to a group of people that happens to include 400 individuals, then the group defamation rule may have application; but to the extent that a party identifies people in that group by their individual names, the group defamation rule no longer applies.

### CONCLUSION

¶ 58 We hold that appellate review of the Pratts' judicial privilege argument is not precluded by the invited error doctrine. We also hold that the Nelsons' statements lost through excessive publication any immunity they may have otherwise enjoyed under the judicial proceeding privilege. Finally, we hold that the group defamation rule does not preclude the Pratts' defamation claim. Therefore, we remand to the district court for further consideration of the Pratts' defamation claim.

¶ 59 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.

---

**113.** *Pratt*, 2005 UT App 541, ¶ 23, 127 P.3d 1256.

**114.** The Nelsons cite 50 Am.Jur.2d *Libel and Slander* § 349 (2006), where the group defamation rule is reiterated in a manner similar to the Restatement version. Section 349 also specifically discusses group size, citing a case from California and stating the following:

> [I]t has been said that when statements concern large groups—in general any group numbering over 25 members—the individual members of that group cannot show that the statements were "of and concerning them." This rule embodies two important public policies: (1) where the group referred to is large, the courts presume that no reasonable reader would take the statements as literally applying to each member; and (2) the limitation on liability safeguards freedom of speech by effecting a sound compromise between the conflicting interests involved in libel cases.

But in *Fawcett*, the Oklahoma Supreme Court held that under the group defamation rule, there is "no substantial reason why *size* alone should be conclusive." 377 P.2d at 51. Rather, the court stated that "the primary consideration would properly seem to be whether the plaintiff was in fact defamed, although not specifically designated." *Id.* at 52 (internal quotation marks and citation omitted). We agree.